******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* CARLTON BUTLER
## (AC 43812)

Prescott, Alexander and Bishop, Js.

*Syllabus*

The defendant, against whom the charges of the crimes of risk of injury to a child and breach of the peace in the second degree were dismissed following his completion of a statutory (§ 54-56*l*) two year, supervised diversionary program for persons with psychiatric disabilities, appealed from the judgment of the trial court granting the state's motion to open the judgment of dismissal. As a condition to his admission to the diversionary program, the defendant agreed that he would not have any contact with minors, which included volunteering or working with minors in any capacity and visiting any areas that were frequented by minors. After the trial court received a report stating that the defendant had successfully completed all of the counseling sessions required by the program, it held a hearing to address the dismissal of the charges. At that hearing, the state argued that the court should not grant a dismissal in light of a final progress report, issued by the Court Support Services Division, which stated that the defendant had not completed the program satisfactorily, and a letter from the defendant's probation officer, which was attached to the report and indicated that the officer had received information from an anonymous source that the defendant recently had volunteered for a YMCA trip that involved minors. The officer stated that he was unable to verify the accuracy of this claim but that the director of a local YMCA had informed him that the defendant had unsuccessfully applied for three employment positions as a camp counselor while he was enrolled in the diversionary program. Additionally, the officer's letter stated that the defendant had failed to report to probation for his last scheduled appointment. The state did not request a continuance or a stay to conduct further investigation into these allegations nor did it offer any testimony or other evidence to corroborate the defendant's purported lack of success in completing the program. In response to the state's argument, defense counsel informed the trial court that the defendant's father, who he claimed drove the defendant everywhere, confirmed that the defendant had not been on a YMCA trip and that he had not driven the defendant to the YMCA to apply for any jobs. The trial court dismissed the case and, the following day, the state filed a motion to open the dismissal, claiming that it had obtained additional information demonstrating that the defendant had not successfully completed the diversionary program, including video footage of the defendant working at a summer camp for children. The trial court granted the state's motion, concluding that the dismissal was erroneously granted because it was based on false information, and the defendant appealed to this court. *Held* that the trial court could not properly entertain or grant the state's motion to open, as it lost subject matter jurisdiction once it dismissed all charges, and, accordingly, the state's only available means to overturn the trial court's decision was through the appeal process, which it elected not to pursue: in the absence of any overriding statutory or constitutional provision, a criminal court's common-law jurisdiction over a criminal proceeding ends after that court renders a final disposition of all charges contained in the information, and, in the present case, the trial court rendered a final judgment when it dismissed the charges against the defendant, and it failed to provide a legal basis for its exercise of power over the motion to open following such judgment; moreover, the statute (§ 52-212a) that provides that a judgment rendered in the Superior Court may be opened if a motion to open is filed within four months of the date on which the judgment was rendered is expressly limited to civil judgments, and our Supreme Court in *State* v. *McCoy* (331 Conn. 561) fully abrogated any suggestion by that court in *State* v. *Wilson* (199 Conn. 417) that the four month rule also applied in the context of final criminal judgments; furthermore, the state failed to satisfy the requirements of the civil rule that a court has intrinsic powers to open a judgment obtained by fraud,

as the trial court did not find that defense counsel's representations were made with an intent to deceive and it did not indicate in granting the motion to open that it was doing so on the basis that the judgment of dismissal was obtained by fraud; additionally, the judgment of dismissal was not analogous to a new prosecution of a defendant on the same charges following a dismissal predicated on the entry of a nolle prosequi, as a judgment following a nolle prosequi is made without prejudice, and public policy did not support the opening of the judgment in the present case, as significant liberty and finality of judgment interests attached when the trial court granted an unconditioned judgment of dismissal and the defendant agreed to take on certain conditions and burdens associated with the program in exchange for the statutory assurance that, if he completed the program, the charges would be erased, and he lost those statutory rights when the trial court opened the judgment through a procedure outside of the statutory scheme.

(*One judge dissenting*)

Argued May 24—officially released December 7, 2021

*Procedural History*

Information charging the defendant with the crimes of risk of injury to a child and breach of the peace in the second degree, brought to the Superior Court in the judicial district of Ansonia-Milford, geographical area number five, where the court, *Brown, J.*, granted the defendant's application to participate in a statutorily authorized diversionary program; thereafter, the court, *McShane, J.*, rendered judgment dismissing the information; subsequently, the court, *McShane, J.*, granted the state's motion to open the judgment of dismissal, from which the defendant appealed to this court. *Reversed*; *judgment directed*.

*Kenneth Rosenthal*, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Margaret E. Kelley*, state's attorney, *Rebecca A. Barry*, supervisory assistant state's attorney, and *Mary A. SanAngelo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. This appeal requires us to determine, as a matter of first impression, whether a criminal court has the power to open a judgment of dismissal rendered by the court after concluding that a defendant satisfactorily has completed a statutorily authorized diversionary program. Specifically, the defendant, Carlton Butler, appeals from the judgment of the trial court granting the state's motion to open a judgment of dismissal that the court rendered following a determination that he satisfactorily had completed a two year, supervised diversionary program for persons with psychiatric disabilities in accordance with General Statutes § 54-56*l*.[1] The defendant claims that the trial court lacked the power to open the judgment of dismissal once rendered and that, by doing so, it violated important liberty and finality of judgment interests. The state responds that the trial court possessed both subject matter jurisdiction and the authority to open the judgment of dismissal because the state filed its motion to open the judgment "within four months [of rendering the judgment of dismissal] and the dismissal was predicated on a material misrepresentation made to the court." We agree with the defendant that the court lacked the power to grant the state's motion to open the judgment. Accordingly, we reverse the judgment of the trial court.

The procedural history relevant to our consideration of the present appeal is not in dispute. In June, 2017, the defendant was charged with risk of injury to a child in violation of General Statutes § 53-21 and breach of the peace in the second degree in violation of General Statutes § 53a-181. The charges arose from an incident that allegedly occurred at a McDonald's restaurant in Derby. According to the state, an employee of the restaurant entered the restaurant's public bathroom and discovered the defendant in a bathroom stall with a twelve year old boy. The employee observed that the boy had his pants down and that the defendant was standing behind and to the side of the boy with his own shorts down and his genitals exposed. When the defendant was contacted by the police, he initially denied being at the restaurant but later claimed that he was helping the boy go to the bathroom.

In August, 2017, the defendant filed an application to participate in the supervised diversionary program for persons with psychiatric disabilities as set forth in § 54-56*l*.[2] On October 2, 2017, on confirmation from the Court Support Services Division that the defendant was eligible for the program and after consideration of the recommended treatment plan, the court, *Brown, J.*, granted the defendant's application and referred the defendant to the Court Support Services Division for supervision in the program. Prior to granting the application, the court canvassed the defendant, who acknowledged that he understood that among the con-

ditions that would be imposed on him if he was allowed to participate in the diversionary program was a requirement that he have no contact with minors, which included not volunteering or working in any capacity with any minors and not going to any areas frequented by minors. The defendant indicated that he was willing to abide by all conditions. The court continued the case until October 2, 2019.

Over the next two years, the defendant struggled with the counseling requirements under the program, which resulted in several additional court appearances. Specifically, on October 4, 2018, the defendant appeared before the court, *McShane, J.*, because he did not successfully complete a mental health program at Connections, Inc., and was discharged from the program. The defendant argued that the probation officer assigned to oversee his case believed that a different program offered at the Sterling Center "would be a better fit for him in consideration of his mental health issues," and he asked the court to allow him to continue in the diversionary program. The court noted that the defendant otherwise appeared to be in compliance with the conditions imposed under the program but ordered that it would need to see a compliance report and to conduct a follow up hearing. Several follow up hearings ensued at which problems regarding the defendant's attendance at counseling sessions were discussed and, ultimately, resolved.

On June 24, 2019, the defendant returned to court, at which time the court indicated that it had received a report that the defendant successfully had completed all of his sessions at the Sterling Center. The court congratulated the defendant on the record, stating: "We get very few success stories here. When the lawyer brought out a letter and I saw it was a long one, I went, well, this isn't going to be good, but it's just the opposite. It was a great letter." The court continued the case to October 2, 2019, for possible dismissal.

The Court Support Services Division issued a final progress report dated September 25, 2019, which indicated that "[t]he [d]efendant has not satisfactorily completed the assigned program . . . ." Attached to the report was a letter from the defendant's probation officer. According to that letter, the probation officer had received information from an anonymous source at the end of August, 2019, that the defendant recently had volunteered for a YMCA trip that involved minors. The probation officer attempted to investigate but was unable to verify the accuracy of the information provided by the anonymous source. The officer nevertheless indicated in his letter that he had learned that the defendant was not allowed to enter YMCAs in Waterbury and Torrington "due to separate undisclosed incidents" and that the director at the Plainville YMCA had informed him that the defendant "had unsuccessfully

applied for three separate employment positions as a 'camp counselor' on [March 15, 2019]." The officer also stated in his letter that the defendant had failed to report to probation on September 18, 2019, as required, and that, as of the date of the letter, the defendant "has failed to contact this officer and his whereabouts are unknown."

At the October 2, 2019 hearing, the court began by noting that "[t]he case today is on for a potential dismissal date." The state, relying on the statements and unsubstantiated allegations contained in the letter attached to the final progress report as well as the factual allegations underlying the criminal charges pending against the defendant, argued that the court should not grant a dismissal of those charges.[3] The state did not request a continuance or stay of the hearing to conduct a further investigation into the allegations in the report, and it offered no testimony, affidavits, or any additional documentary evidence to corroborate the defendant's purported lack of success in completing the diversionary program or his lack of compliance with conditions imposed by the court in granting the defendant's application for the program.

Defense counsel, in response to the state, argued that he also found the letter attached to the final report concerning "but for different reasons than the state." He continued: "[The defendant] does not own a driver's license. He does not own a car. His father drives him everywhere. His father is present here in the courtroom and is willing to come up and talk to Your Honor. Your Honor, I talked to [the defendant's] father who stated that [the defendant] has never gone on a YMCA trip as a volunteer. He's also indicated to me that he's never— they live in Waterbury. He's also indicated to me that he's never driven [the defendant] to the Plainville YMCA to apply for a job.

"Secondly, Your Honor, the reason why [the defendant] is not allowed at the YMCAs is because prior to this case—prior to the supervised Diversionary Program being granted, he was going to the YMCA. While the case was pending, he was going to the YMCA. At that point someone notified the YMCA of his arrest. They told him he was no longer allowed back. So I found it concerning in this letter that some of this information is very dated. Okay? And secondly, based on his father's own representation to me, false.

"It's true, [the defendant] will admit that he did not go to his last probation meeting on September [18, 2019]. [The defendant] forgot about it. After two years it's the one and only one he's ever missed. [The defendant] is attending Goodwin College, however I know [the defendant] likes to tell people he's living in East Hartford, but after speaking with his father, he still lives at home with his father. His father drives him to Goodwin College. I know in chambers, Your Honor, I

had indicated that [the defendant] did apply for an adult counselor position, but that was through Easter Seals. That was not through the YMCA. So we don't even know if this YMCA application is [the defendant] himself. [The defendant's] father would probably tell Your Honor, because he's told me that he's never driven [the defendant] to the Plainville YMCA. To his knowledge, [the defendant] has never applied to be—through the YMCA for anything. He's never, to his knowledge, ever went on a trip with minors. [The defendant's] only mode of transportation is through his father. He's never taken his father's car without permission. [The defendant] doesn't own a car. He doesn't have a driver's license.

"So for those reasons, Your Honor, I find this letter very concerning because a lot of it—it's a lot of allegations that's refuted by [the defendant's] own father, who—I'll be honest with you, through the course of knowing [the defendant], he's a very honest man, would not lie on his son's behalf. Your Honor, so essentially the only thing that is a fact and is true is that [the defendant] missed his last probation meeting on September 18, however the probation officer left a card for [the defendant] to go on October 1. [The defendant] showed up on October 1. [The defendant] went to the meeting with the officer, and the officer said that [the defendant] got agitated. Well, [the defendant] got agitated because his probation officer told him that he was going to send in a bad report, and that [the defendant] was not going to successfully complete the program.

"I think up to [this] point, Your Honor, [the defendant] has fulfilled everything on the Supervised Diversionary Program. He paid for the Sterling Center out of pocket. He's on disability. It was a financial hardship for him and his father. The allegations of him going to the YMCA during the pendency of him being on the Supervised Diversionary Program is unfounded, unfounded and refuted by the only person he can get a ride from. For those reasons, Your Honor, I think [the defendant] should have a successful dismissal on this program." Defense counsel did not call the defendant's father to testify on the record regarding the representations that he had made or offer any other evidence to the court at the hearing.

After hearing from the defense, the court asked whether the state had anything further to present. The state did not ask for an opportunity to question the father under oath regarding defense counsel's representations and, again, did not request a continuance of the hearing. The court, therefore, had no testimony from any witnesses under oath or any evidence introduced by the state to form a basis to sustain the objection to the dismissal. Rather, the state briefly responded: "I appreciate that counsel is arguing that there's no evidence that the defendant did what's alleged in the proba-

tion report, however I think that, as the court knows, while his father may be an honest person, that's all well and good, but I'm sure [the defendant] can find his way around if need be. So my concern is, how did [the defendant] get to that McDonald's on the day in question. This goes back to June, 2017. My concern is for that young boy, who was there in the stall with [the defendant], and all the young boys out here. So I would ask Your Honor not to dismiss the charges." Rather than presenting evidence to support its objection to the dismissal, the state directed its objection at the argument of counsel and the nature of the offense.

After hearing from the state, the court immediately rendered the following oral ruling: "The court has considered the argument of counsel and actually, the state's argument, although very well articulated, is misplaced in that that objection, and I'm sure it was at the time, was forwarded or made by [the attorney] representing the [state] at that time, but nevertheless, the judge granted the program. The fact that the defendant switched to Sterling Program is actually in his favor. That is a much more difficult program and a much more—one of better reputation than the other program [that] was originally recommended.

"So what the court has before it is an individual who missed his last appointment, and the fact that this case has been pending since June of 2017, with no arrests certainly speaks in defendant's behalf. I certainly understand the state's concern with regards to the defendant working as a camp counselor, but I am concerned of the fact that this was an anonymous tip that was not looked into by the Office of Adult Probation other than just to receive it without making phone calls. It doesn't appear as though any of it is in fact true. The defendant had numerous appointments during the way, he had his bumps along the way and ended up making those. You know, it's something that he applied for back on October [2, 2017], with the understanding that if he did what he was supposed to do, it would be dismissed. He did what he was supposed to do. The case is therefore dismissed." The state made no further statements on the record.[4]

The following day, the state filed a "motion to reopen dismissal." According to the state, information had come to the state's attention subsequent to the court having rendered the judgment of dismissal that demonstrated that the defendant had not completed the diversionary program successfully, and the state asked the court to open the case for further prosecution. In support of its motion, the state asserted that the court had relied on representations by defense counsel "that have proven false." It further asserted that "[t]here is footage of the defendant working at a summer camp in Massachusetts that was taken this summer." The state indicated that the Office of Adult Probation would provide

the court with a "more detailed report as to the parties that describes the defendant's noncompliance with the court set conditions for [the diversionary program]." Finally the state asserted that the court "maintains authority to reopen this case based upon *State* v. *Johnson*, 301 Conn. 630, 643, 26 A.3d 59 (2011); *Tyson* v. *Commissioner of Correction*, 155 Conn. App. 96, 105, 109 A.3d 510, cert. denied, 315 Conn. 931, 110 A.3d 432 (2015); [and] *State* v. *O'Bright*, 13 Conn. App. 732, 539 A.2d 161 (1988)."

The defendant filed an objection to the state's motion. He argued that the cases relied on by the state were inapposite to the court's consideration of whether it properly could open a dismissal of his criminal charges. The defendant took the position that such a dismissal could not be set aside except after review by an appellate court on appeal. The defendant also argued that the state's motion to open was "against public policy and a dangerous precedent." According to the defendant, the state was asking the court "to endanger all current and past defendants who used a diversionary program but are still within the statute of limitations for their alleged crimes." The defendant contended that opening a dismissal under these circumstances is particularly troublesome because a defendant must agree to the tolling of the statute of limitations in order to participate in a diversionary program and never is advised that, after a dismissal of charges is obtained, the dismissal potentially could be opened at a later date and the charges reinstated.

The court held a hearing on the motion to open on October 15, 2019. At the hearing, the court entered as court exhibits (1) an "addendum" to the letter that was attached to the final report from the defendant's probation officer[5] and (2) a five page report dated October 4, 2019, from the probation officer to the supervisory assistant state's attorney detailing the officer's supervision of the defendant over the entire duration of the program and voicing the officer's concern that the defendant "continues to seek contact with minors and actively engages in deceptive behavior to conceal such contact." With respect to the new information contained in the report, the officer stated: "Unfortunately, this officer was unable to communicate this information to the court prior to the dismissal of the Supervised Diversionary Program due to the time frame of the information being confirmed."[6]

Following argument, the court granted the state's motion to open. Although the court noted on the papers only that the "[d]ismissal was erroneous," it signed a copy of the transcript of the hearing at which it orally provided a more fulsome explanation for its ruling. In relevant part, the court stated: "[L]ook, I don't know a lot about subject matter jurisdiction. I know I looked at the cases that the state has provided with and *none*

*of them seem to be quite on point.* But I also know what the right thing to do is. And *the right thing to do in this particular case is to reopen this case* and have the defendant—and I say and have the defendant face the charges. I say that because this dismissal was granted under erroneous grounds. The dismissal was false, with false information. And, [defense counsel], nobody has put any dispersions to you on there, but I—and I'm not going to ask for—elicit a response, but *it is wrong.* It is wrong the defendant received a dismissal. *Just as if it was a clerical error, I will say this was an error in that I had none of this information before me.* And, you know, *this isn't an operating under suspension.* The public policy, I mean, involved here is more significant to that."[7] (Emphasis added.) Although the court indicated that the dismissal was granted on the basis of erroneous information, the court made no express finding that the state had established by clear and convincing evidence any fraud on the court.[8] Rather, as reflected in the emphasized language, the court's decision to vacate the dismissal appears to turn on the serious nature of this offense and not whether the state's "motion to reopen" was the proper procedure. This appeal followed.[9]

The defendant claims on appeal that the trial court lacked the power to open and set aside the unconditional dismissal of his criminal charges following his completion of the diversionary program and, in so doing, deprived him of significant liberty and finality of judgment interests. The state responds that the trial court possessed both the subject matter jurisdiction and the authority to open the judgment,[10] and properly did so under the circumstances of this case. We agree with the defendant that the trial court lost subject matter jurisdiction in this matter once it rendered the judgment of dismissal. Accordingly, it improperly granted the state's motion to open and reinstated the criminal charges against the defendant.

We begin with our standard of review. Whether the trial court had the power to consider and grant the state's motion to open after the court had dismissed all charges pending against the defendant raises a question of law over which we exercise plenary review. See *Tarro* v. *Mastriani Realty, LLC*, 142 Conn. App. 419, 431, 69 A.3d 956 ("[a]ny determination regarding the scope of a court's subject matter jurisdiction or its authority to act presents a question of law over which our review is plenary"), cert. denied, 309 Conn. 912, 69 A.3d 308 (2013), and cert. denied, 309 Conn. 912, 69 A.3d 309 (2013).

As we previously indicated, the question before us is one of first impression. The existing legal landscape regarding the jurisdiction and authority of our criminal courts is limited primarily to discussions of the criminal court's power to act postconviction. Because there is

scant authority discussing the criminal court's power to act on motions or otherwise following an outright dismissal of criminal charges, we look first to our existing jurisprudence as it pertains to the jurisdiction of our criminal courts generally. We then examine civil law analogs and their applicability in the criminal context. Next, we review relevant and persuasive authority from other jurisdictions. Finally, we turn to a policy discussion, including due consideration of the parties' varied legal interests. Ultimately, we conclude that the court improperly granted the state's motion to open because, in the absence of any codified authorization, either express or clearly implied, a criminal court cannot take further action in a criminal matter once there has been a complete and final resolution of all pending charges, which would include the judgment of dismissal rendered in the present case.

## I
### GENERAL BACKGROUND

"This state has a unified court system. Thus, all criminal and civil matters, including juvenile matters, fall within the subject matter jurisdiction of the Superior Court." (Internal quotation marks omitted.) *State* v. *Fernandes*, 300 Conn. 104, 106 n.3, 12 A.3d 925, cert. denied, 563 U.S. 990, 131 S. Ct. 2469, 179 L. Ed. 2d 1213 (2011). "The Superior Court is a constitutional court of general jurisdiction. *In the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Ramos*, 306 Conn. 125, 133–34, 49 A.3d 197 (2012). "The Superior Court's authority over criminal cases is established by the proper presentment of the information . . . which is essential to initiate a criminal proceeding." (Internal quotation marks omitted.) *State* v. *Daly*, 111 Conn. App. 397, 401–402, 960 A.2d 1040 (2008), cert. denied, 292 Conn. 909, 973 A.2d 108 (2009); see also *Reed* v. *Reincke*, 155 Conn. 591, 598, 236 A.2d 909 (1967) ("[a]rrest and detention are primarily for security purposes and not for the purpose of conferring jurisdiction").

At common law, "a trial court possesse[d] the inherent power to modify its own judgments during the term at which they were rendered. . . . During the continuance of a term of court the judge holding it ha[d], in a sense, absolute control over judgments rendered; that is, he can declare and subsequently modify or annul them. . . . Under the [common-law] rule, a distinction [was] drawn between matters of substance and clerical errors; the distinction being that mere clerical errors may be corrected at any time even after the end of the term. . . . But [i]n the absence of waiver or consent of the parties, a court [was] without jurisdiction to modify or correct a judgment in other than clerical respects after the expiration of the term of the court in which it was rendered." (Citations omitted; internal

quotation marks omitted.) *State* v. *Wilson,* 199 Conn. 417, 436–37, 513 A.2d 620 (1986).[11]

Regardless, that particular rule is no longer part of our common law. Courts previously had "interpreted the word 'term' as used in the [common-law] rule that a judgment may not be modified in substance after the term at which it was rendered to mean 'sessions' of court as that period was defined in earlier enactments of General Statutes § 51-181. . . . The present version of . . . § 51-181, however, makes no reference to 'sessions' of court, and provides simply that '[t]he superior court shall sit continuously throughout the year, at such times and places and for such periods as are set by the chief court administrator.' " (Citations omitted.) Id., 437. Accordingly, even if once applicable in criminal cases, the common-law rule regarding a court's " 'absolute control over judgments' " during the continuance of the term in which the judgment was rendered; id., 436; has been superseded or rendered inoperable by statutory changes and, thus, does not factor into our consideration of the jurisdiction of the criminal court as it currently exists under our common law. See also *State* v. *Luzietti,* 230 Conn. 427, 432 n.6, 646 A.2d 85 (1994) (recognizing that criminal court's common-law jurisdiction to vacate judgment during " 'term' " in which it had been rendered "no longer has vitality in this state").

A bright-line rule exists regarding a criminal court's continuing jurisdiction in a criminal matter following a conviction. "It is well established that under the common law a trial court has the discretionary power to modify or vacate a criminal judgment *before the sentence has been executed.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Waterman,* 264 Conn. 484, 491, 825 A.2d 63 (2003). This is because "[t]he jurisdiction of the sentencing court terminates when the sentence is put into effect, and that court may no longer take any action affecting the sentence unless it has been expressly authorized to act. . . . The legislature has granted the trial courts continuing jurisdiction to act on their judgments [in criminal matters] after the commencement of sentence under a limited number of circumstances." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id. For example, General Statutes §§ 53a-29 through 53a-34 authorize the court to modify the terms of probation even after a sentence is imposed. General Statutes § 52-270 grants the court jurisdiction to hear a petition for a new trial filed postsentence. General Statutes § 53a-39 allows courts, under prescribed circumstances, after a hearing, and for good cause shown, to reduce a sentence, to order a defendant discharged, or to place a defendant on probation or conditional discharge. See also id., 492. No statutory provisions exist, however, that expand the existing common-law jurisdiction of our criminal courts or expressly permit a

court to reinstate criminal charges after it has dismissed them. In the absence of any overriding statutory or constitutional provision, a criminal court's common-law jurisdiction over a criminal proceeding ends after that court renders a final disposition of all charges contained in the information, whether by an adjudication of the merits or by dismissal.[12] Moreover, although well delineated legal parameters do exist with respect to the opening of civil judgments, there are no analogous rules of practice or statutory provisions that delineate the scope of the court's power to open a judgment in a criminal case. Because the state argues that existing rules applicable to civil judgments nonetheless should govern the outcome of the present appeal, we turn to a discussion of these rules and their applicability.

## II
## CIVIL LAW ANALOGS

### A
### "Four Month" Rule

Under our common law, "[t]rial [c]ourts have an inherent power to open, correct and modify . . . [*a*] *civil judgment* . . . and, therefore, have general subject matter jurisdiction to adjudicate motions to open." (Emphasis added; internal quotation marks omitted.) *Wolfork* v. *Yale Medical Group*, 335 Conn. 448, 468–69, 239 A.3d 272 (2020); id., 469 and n.12 (recognizing distinction between civil and criminal judgments). "[General Statutes §] 52-212a provides in relevant part: Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, *a civil judgment or decree* rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. . . . Practice Book § 17-43 contains similar language [limiting its applicability to civil matters]. Courts have interpreted the phrase, [u]nless otherwise provided by law, as preserving the common-law authority of a court to open a judgment after the four month period. . . . It is well established that [*c*]*ourts have intrinsic powers, independent of statutory provisions authorizing the opening of judgments, to vacate* [*or open*] *any judgment obtained by fraud, duress or mutual mistake*." (Citation omitted; emphasis added; internal quotation marks omitted.) *Simmons* v. *Weiss*, 176 Conn. App. 94, 98–99, 168 A.3d 617 (2017).

We are unconvinced that these common-law " 'intrinsic powers' " to open a civil judgment; id., 99; necessarily existed with respect to criminal judgments or, if they did, that they have retained their viability. As previously stated in this opinion, it is a well settled rule that, "[i]n criminal cases . . . a trial court loses jurisdiction upon the execution of the defendant's sentence, unless it is expressly authorized to act."[13] (Internal quotation marks omitted.) *Wolfork* v. *Yale Medical Group*, supra,

335 Conn. 469 n.12. That well established rule, however, by its very terms, has no direct applicability with respect to a final disposition of a criminal case like the one before us. In the present case, the court completely disposed of the criminal matter before it, not by virtue of a judgment of conviction, but by rendering a judgment of dismissal of the criminal charges on October 2, 2019. If a court unconditionally dismisses all pending charges, then, as is the case with an acquittal, the need for sentencing or some other action by the court does not exist before the judgment may be deemed final. See *State* v. *Bemer*, 339 Conn. 528, 537, A.3d (2021) ("[t]he appealable final judgment in a criminal case is *ordinarily* the imposition of sentence" (emphasis added; internal quotation marks omitted)). It follows that in cases in which a court dismisses all charges set forth in an information unconditionally, such a court has rendered a final judgment, and, unlike in the case of a conviction, we see no compelling rationale for recognizing any continuing jurisdiction of the criminal court following such a disposition. As we have discussed, any common-law "absolute control" or continuing jurisdiction to vacate a criminal judgment during the "term" in which it was rendered is no longer viable, and we are not aware of any other surviving contradictory common-law rule conferring jurisdiction to a criminal court to act postjudgment.

The state, nevertheless, would have us reach a contrary conclusion, largely on the basis of our Supreme Court's decision in *State* v. *Wilson*, supra, 199 Conn. 436–37, the relevant holding of which was, at least in part, abrogated by *State* v. *McCoy*, 331 Conn. 561, 206 A.3d 725 (2019). Although the state acknowledges *McCoy*'s abrogation of *Wilson*, it argues for a very narrow construction of it. We conclude that the state's arguments are unconvincing and that *Wilson* properly cannot be read as expanding the common-law jurisdiction of the criminal court to permit the granting of a motion to open following a judgment of dismissal.

Before turning to our discussion of *Wilson*, however, we note that the state no longer relies on the case law that it cited in its motion to open in support of its assertion that "the [c]ourt maintains authority to reopen this case . . . ." See *State* v. *Johnson*, supra, 301 Conn. 643; *Tyson* v. *Commissioner of Correction*, supra, 155 Conn. App. 105; *State* v. *O'Bright*, supra, 13 Conn. App. 732. Although the state attached copies of all three opinions to its motion to open, it provided no written analysis of them nor mentioned them in its argument to the trial court at the hearing on the motion to open. Despite ruling in favor of the state, the trial court indicated in its oral decision that none of the cases cited by the state as favoring the granting of a motion to open the judgment "seem[s] to be quite on point." The state also has not discussed these cases in its brief to this court. In short, the record contains no argument

by the state regarding how these cases are instructive and, without the benefit of such input, we are left to agree with the assessment of the trial court and the defendant that these cases are inapposite to the issue before us.[14]

In *Wilson*, the defendant appealed from a judgment of conviction of manslaughter, claiming in relevant part that the court improperly had denied a motion to suppress certain incriminatory statements that he made to the police during a station house interrogation. *State* v. *Wilson*, supra, 199 Conn. 419. Dispositive of the defendant's claim was whether the defendant ever invoked his right to counsel. Id., 426–27. Conflicting evidence on that issue was presented to the trial court at the suppression hearing. Id., 427. The trial court initially rendered an oral decision finding that the defendant never had asked for counsel. Id., 429–30. The court later filed a written memorandum in which it seemed to contradict its oral finding, stating that the defendant had expressed a desire to obtain a lawyer. Id., 430–32. Some three years after the defendant was sentenced, the state filed a motion for articulation asking the trial court for a definitive ruling as to whether the defendant had invoked his right to counsel. Id., 432. In response to the state's motion, the trial court filed an amended memorandum stating that it did not credit the defendant's testimony that he had requested counsel. Id., 433. The defendant filed a motion for review asking that the court's amended memorandum of decision be stricken. Id., 437–38. Our Supreme Court denied the motion without prejudice to its renewal on appeal. Id., 438. On later consideration, our Supreme Court concluded that "[t]he trial court was without jurisdiction to amend in matters of substance its original memorandum of decision more than four months after sentence had been imposed" and, accordingly, ordered the amended memorandum of decision to be stricken from the record. Id. Ultimately, the defendant was granted a new trial, which was to include relitigation of whether the defendant had requested counsel. Id., 445.

In addressing whether a criminal court, in response to a motion for articulation/rectification, could substantively alter or modify its ruling on a motion to suppress, the court in *Wilson* had occasion to discuss a criminal court's power to open and modify a judgment. See id., 437. It recognized, as we already have stated, that "[n]either our General Statutes nor our Practice Book rules define the period during which a trial court may modify or correct its judgment in a *criminal* case. On the *civil* side, however, Practice Book § 326 [now § 17-4] provides that any civil judgment or decree may be opened or set aside within four months succeeding the date on which it was rendered or passed. We see no reason to distinguish between civil and criminal judgments in this respect, and we therefore hold that, for purposes of the [common-law] rule, a criminal judgment may not be

modified in matters of substance beyond a period of four months after the judgment has become final." (Emphasis in original; internal quotation marks omitted.) Id. Because it determined that the trial court, in response to the state's motion, had modified substantively its judgment more than four months after that judgment became final, it ordered those changes stricken from the record. Id., 438.

Subsequently, in *State* v. *Myers*, 242 Conn. 125, 698 A.2d 823 (1997), our Supreme Court, citing its decision in *Wilson*, held that a criminal court "retained jurisdiction" to entertain a motion for a new trial, even after sentencing, because "it could have opened the judgment." Id., 136. The Supreme Court reversed the decision of the criminal court, which had vacated its initial decision granting the defendant's motion for a new trial. Id., 139. Although the defendant had filed his motion prior to sentencing, the criminal court did not consider and decide the motion until after it imposed a sentence. Id., 129, 131. The criminal court had concluded that it improperly granted the motion for a new trial because (1) the defendant's claim of juror bias should have been raised by way of a petition for a new trial pursuant to § 52-270, and (2) "ruling on the defendant's motion after imposing sentence was improper . . . ." (Internal quotation marks omitted.) Id., 136. The Supreme Court agreed with the position of the state that the defendant's motion, which was filed in the confines of the existing criminal matter, could not properly be construed as a petition for a new trial over which the court had statutory authority to act postsentencing.[15] Id., 135–36. The court, however, also agreed with the defendant that a claim of juror bias properly could be brought either by way of a motion for a new trial or a petition for a new trial. Id., 134. The Supreme Court rejected without analysis the trial court's reasoning that it had lacked the power to act on a pending motion following sentencing. Id., 136.

More recently, however, our Supreme Court, in *State* v. *McCoy*, supra, 331 Conn. 574–89, abrogated its decisions in *Wilson* and *Myers* to the extent that each decision implied that the civil, four month rule created an exception to the common-law notion that the criminal court lost jurisdiction following sentencing. Part of the certified question in *McCoy* was whether the Appellate Court improperly had concluded that the trial court properly denied the defendant's motion for a new trial for lack of jurisdiction. Id., 564.

The defendant in *McCoy* was convicted of murder. Id. The relevant underlying procedural history was as follows: "After the jury returned its verdict, but prior to the sentencing date, the defendant filed a motion for a new trial. . . . At the sentencing hearing, the defendant sought to have the motion heard by the trial court; however, the parties and the trial court subsequently

agreed to go forward with the sentencing and to hear the motion at a later date. . . . As a result, the sentencing hearing went forward, and the court sentenced the defendant to sixty years incarceration. . . .

"Months after the sentencing, the defendant attempted to have his motion for a new trial heard. Because the defendant's sentence already had been executed, however, the court denied the motion without a hearing on the ground that it had lost jurisdiction." (Citations omitted.) Id., 565.

In addressing whether a criminal court had any power to consider a motion for a new trial that, like in *Myers*, was filed but not acted on prior to the imposition of a sentence, the court revisited *Wilson*'s holding that the four month rule for opening judgments in civil cases applied equally to judgments rendered in criminal court as well as its subsequent reliance on *Wilson* in *Myers*. See id., 574–75, 580–81. After a lengthy discussion of the "jurisdiction of criminal courts relating to sentencing," the court abrogated its statement in *Wilson*. Id., 578, 586–87. It explained: "[G]iven the long and consistent history of our courts applying the traditional rule that jurisdiction is lost upon the execution of a sentence, we cannot conclude that *Myers* reflects a retreat from that common-law rule. Instead, we acknowledge that *Myers* and *Wilson* are anomalies in this court's case law, and we take this opportunity to clarify and reiterate, as we have consistently done since *Myers*, that a trial court loses jurisdiction once the defendant's sentence is executed, unless there is a constitutional or legislative grant of authority." Id., 586–87. The court also suggested that *Wilson*'s co-opting of the four month rule in criminal matters was essentially dicta because, "[d]espite making this pronouncement [about the four month rule], [the court in *Wilson*] did not use the four month rule to find that the trial court had jurisdiction. Instead, this court concluded that the trial court in that case was *without jurisdiction* to modify the judgment . . . explain[ing] that the judgment in this case became final when the defendant was sentenced . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 581. In other words, it was the finality of the judgment that caused the court to lose jurisdiction.

The state argues that *McCoy* abrogated only the four month rule in criminal matters in cases that have ended by the imposition of a sentence and, thus, if "a defendant's case ends by some mechanism other than the execution of his sentence, the trial court retains its inherent common-law authority to modify its judgment within a four month period." We disagree with the state's reading of *McCoy* for the following reasons.[16]

First, the four month time period is not itself a creature of the common law; indeed, no such rule existed. Rather, it is the result of legislation and court rule,

both of which expressly limit its application to a "civil judgment or decree . . . ." General Statutes § 52-212a; Practice Book § 17-4. In other words, those enactments by their very terms do not apply to criminal matters.

Second, the court in *Wilson* provided absolutely no rationale for extending the four month rule to criminal judgments, except that it saw "no reason to distinguish between civil and criminal judgments in this respect . . . ." *State* v. *Wilson*, supra, 199 Conn. 437. *Wilson*, however, failed to address the significant liberty interests that arise in criminal matters that, generally speaking, are simply not at stake in civil litigation.

Finally, in abrogating the rule announced in *Wilson*, the court in *McCoy* did not attempt to make the distinction that the state asks us to draw. Rather, the court recognized that *Wilson* and *Myers* were legal "anomalies." *State* v. *McCoy*, supra, 331 Conn. 586. We construe *McCoy* as having fully abrogated in the context of final criminal judgments any application of the four month rule, which applies only in civil matters.

B
Judgments Obtained by Fraud

In the civil context, in addition to the four month rule, it has long been recognized that a court has intrinsic power to open a judgment obtained by fraud. As our Supreme Court has stated: "The power of the court to vacate a judgment for fraud is regarded as inherent and independent of statutory provisions authorizing the opening of judgments; hence judgments obtained by fraud may be attacked at any time." (Internal quotation marks omitted.) *Billington* v. *Billington*, 220 Conn. 212, 218, 595 A.2d 1377 (1991). It is unnecessary to decide at this juncture, however, whether this particular civil rule applies equally in the criminal context[17] because, even assuming without deciding that it does, we are unconvinced that the record in the present case would support a finding that a fraud, as opposed to a negligent misrepresentation, was perpetrated on the court. Moreover, the state never asked the court to make such a finding.

"[If] a party seeks to open and vacate a judgment based on new evidence allegedly showing the judgment is tainted by fraud, he must show, inter alia, that he was diligent during trial in trying to discover and expose the fraud, and that there is clear proof of that fraud." *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 107, 952 A.2d 1 (2008). Neither prong of this test is met in the present case. "[A] fraudulent representation . . . is one that is knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it." (Internal quotation marks omitted.) *Sturm* v. *Harb Development, LLC*, 298 Conn. 124, 142, 2 A.3d 859 (2010). In other words, to constitute a fraud on the court, a factual misrepresentation by a

party must be made with an intent to deceive.

Here, there is no basis on which to conclude that a lack of good faith by counsel existed in relying on information provided by the defendant's father or that the defendant had admitted to him that he had had contact with minors. The court never found that defense counsel's representations to the court at the October 2, 2019 hearing, even those that ultimately were determined to be untrue, were made with any intent to deceive the court.[18] More importantly, the court, in granting the motion to open, never indicated it was doing so on the basis that the judgment of dismissal was obtained by fraud, specifically noting to defense counsel that "nobody has put any dispersions to you . . . ."

### III
### DISMISSALS WITHOUT PREJUDICE/
### NOLLE PROSEQUI

Additionally, the state appears to argue that a court necessarily must have the power to consider and grant a motion to open a judgment of dismissal because a new criminal prosecution of the same defendant on the same charges following a dismissal predicated on the entry of a nolle prosequi is permissible. A dismissal following a nolle prosequi, however, which effectively is rendered without prejudice to the filing of a new action if otherwise permitted by law, is markedly different from the judgment of dismissal rendered in the present case.

Although our rules of practice formerly authorized a criminal court to designate a dismissal as entered " 'without prejudice,' " that rule has since been repealed. *State* v. *Talton*, 209 Conn. 133, 140 and n.10, 547 A.2d 543 (1988). Presumably, any dismissal of charges by the court is now presumptively deemed "with prejudice" unless reinstatement or refiling of charges is otherwise provided for by law. As former Chief Judge Lavery explained in his dissenting opinion in *Cislo* v. *Shelton*, 40 Conn. App. 705, 719–20, 673 A.2d 134 (1996), rev'd, 240 Conn. 590, 692 A.2d 1255 (1997): "There was no practical difference between a dismissal without prejudice and a nolle. Practice Book § 727 [now § 39-31], in discussing nolles prosequi, provides: The entry of a nolle prosequi terminates the prosecution and the defendant shall be released from custody. If subsequently the prosecuting authority decides to proceed against the defendant, a new prosecution must be initiated. In *State* v. *Talton*, [supra, 141 n.11], and *State* v. *Gaston*, 198 Conn. 435, 440–41, 503 A.2d 594 (1986), our Supreme Court recognized that the only difference between a dismissal and a nolle is the time of erasure. Under General Statutes § 54-142a (b), the records of an arrest are immediately erased on a dismissal, whereas, when a nolle is entered, the records of the arrest are erased thirteen months after its entry. General Statutes

§ 54-142a (c)." (Internal quotation marks omitted.)

"A nolle prosequi is a declaration of the prosecuting officer that he will not prosecute the suit further at that time. . . . [T]he effect of a nolle [prosequi] is to terminate the particular prosecution of the defendant without an acquittal and without placing him in jeopardy. . . . Therefore, the nolle [prosequi] places the criminal matter in the same position it held prior to the filing of the information. Indeed, no criminal matter exists until, and if, the prosecution issues a new information against the defendant. . . . If subsequently the prosecuting authority decides to proceed against the defendant, a new prosecution must be initiated. . . .

"Until the enactment of General Statutes [§ 54-56b] in 1975 . . . the power to enter a nolle prosequi was discretionary with the state's attorney; neither the approval of the court nor the consent of the defendant was required. . . . The principles that today govern the entry of a nolle prosequi place some restrictions on the prosecuting attorney's formerly unfettered discretion. Although the decision to initiate a nolle prosequi still rests with the state's attorney, the statute and the rules now permit the defendant to object to a nolle prosequi and to demand either a trial or a dismissal except upon a representation to the court by the prosecuting official that a material witness has died, disappeared or become disabled or that material evidence has disappeared or been destroyed and that a further investigation is therefore necessary." (Citations omitted; internal quotation marks omitted.) *State* v. *Richard P.*, 179 Conn. App. 676, 682–83, 181 A.3d 107, cert. denied, 328 Conn. 924, 181 A.3d 567 (2018). In the absence of an objection by the defendant, a nolle prosequi essentially results in a resolution of the matter without prejudice, meaning the state may refile the same charges provided it does so within any applicable statute of limitations. Accordingly, it would be improper to analogize a judgment of dismissal following a nolle prosequi to the judgment of dismissal in the present case rendered after the completion of a statutory diversionary program.

IV
DECISIONS OF OTHER JURISDICTIONS

Neither party has brought to our attention any case law from other jurisdictions addressing the power of a trial court to open or set aside a dismissal of criminal charges following the completion of a pretrial diversionary program. Our own research reveals that there are no decisions that are on all fours with the present case. We have identified a number of decisions addressing whether a court, following the state's entry of a nolle prosequi, has the ability to restore the criminal case to the docket, particularly in cases in which the state could otherwise commence an entirely new prosecution. Given the decidedly different procedural posture of

these types of cases as well as the different statutory overlays that exist in other jurisdictions, these cases are readily distinguishable and further discussion of them would be unhelpful.

We nonetheless do find at least one sister state decision instructive with respect to the issue before us. Specifically, the issue before the court in *Smith* v. *Superior Court*, 115 Cal. App. 3d 285, 287, 171 Cal. Rptr. 387 (1981), is notably similar to the one now before us: "[W]hether a trial court may reconsider and vacate an order dismissing a prosecution where there is an allegation that extrinsic fraud or mistake has taken place and that new facts would alter the court's decision." The California Court of Appeals concluded that, "at least where no actual fraud has been perpetrated upon the court, a criminal court has no authority to vacate a dismissal entered deliberately but upon an erroneous factual basis." Id.

The facts underlying the court's dismissal in *Smith* were as follows. The defendant successfully appealed his conviction of embezzlement of a rental car, arguing that certain evidence admitted against him was the byproduct of an illegal search. Id. The appeal was decided by the intermediate appellate court and California's Supreme Court denied the state's request to appeal. Id. On remand, defense counsel and the prosecutor met with the judge in chambers to discuss the possibility that the prosecution should be dismissed because, without the excluded evidence, the prosecutor believed he would be unable successfully to retry the defendant. Id. "The prosecutor and the court were under the impression that there were no pending appellate matters in the case, defense counsel having so represented. The court entertained and granted the prosecution's motion to dismiss." Id., 287–88. Soon afterward, however, the prosecutor learned that the state was in the process of filing a petition for certiorari in the United States Supreme Court and had, in fact, filed an application for a stay pending its preparation and filing of that petition. Id., 288. Although the public defender's office also was aware of the pendency of the petition, neither of the trial attorneys apparently was informed by his respective office. Id. When the prosecutor learned about the pending proceedings, he moved the court to vacate its order of dismissal. Id. Following a hearing, the trial court granted the motion to vacate and reinstated the charges. Id. The defendant appealed. Id.

On appeal, the court noted that "the limits of a criminal court's power to reconsider a ruling and vacate an order or judgment, though referred to in passing, have to some extent been left open by the California Supreme Court." Id. After noting conflicting language in its existing case law, the court rejected the state's argument that the court had "inherent equity powers," as

recognized in civil matters, to set aside a judgment that was obtained by fraud or mistake. Id., 292. The court took note of prior precedent that had distinguished a court's inherent power to correct clerical errors necessary to make its records reflect the true judgment of the court and judicial error, or error made in rendering a judgment properly reflected in the record. Id., 290–91. The court stated that "[a]ny attempt by a court, under the guise of correcting clerical error, to revise its deliberately exercised judicial discretion is not permitted." (Internal quotation marks omitted.) Id., 290. The court further stated: "Even granting that criminal courts have inherent powers which they may exercise in various contexts, a large step must be taken before concluding that a criminal judgment or an order dismissing a prosecution can be disturbed because of a mistake in the presentation of the operative facts." Id., 292–93. We find these same admonitions persuasive and relevant to our consideration of the matter before us because the cases invoke many of the same policy considerations.[19]

## V
## POLICY CONSIDERATIONS

As we have indicated, we agree with the defendant that the court's judgment dismissing the criminal charges in the present case effectively was a judgment of dismissal "with prejudice." This is because, by statute, the court's determination that the defendant satisfactorily completed the program meant that "all records of such charges shall be erased pursuant to section 54-142a." General Statutes § 54-56*l* (i). In other words, unlike when a case is resolved by a nolle prosequi or the court dismisses an information under circumstances in which the state may refile charges, the dismissal of pending criminal charges following the determination by the court that the defendant successfully has completed a diversionary program as authorized by § 54-56*l* results in a complete erasure of the charges that led to the defendant's participation in the program,[20] without the risk that such charges could be revived or reinstated at a later date.

By applying to participate in the supervised diversionary program and being permitted by the court to do so, the defendant gave up his right to defend against the allegation leveled by the state and agreed to be subject to numerous conditions in excess of those imposed by the court as conditions of his release. The defendant also took on burdens he would not have otherwise had, including the time and costs associated with his participation in various program requirements. As one example, the record indicates that the defendant paid for his counseling at the Sterling Center. He agreed to do so in exchange for the statutory assurance that, if he completed the program, his charges would be erased, meaning he would no longer face any legal jeopardy associated with those charges. In other words, his par-

ticipation in the program came with certain statutory rights that he lost when the court opened the judgment of dismissal by a procedure that was not part of the statutory scheme.

Furthermore, it is indisputable that significant liberty and finality of judgment interests also attach by virtue of the court's granting of an unconditioned judgment of dismissal. "A great deal is at stake in a criminal trial. The interests involved go beyond the private interests at stake in the ordinary civil case. They involve significant public interests. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. . . . Indeed, the criminal jury trial has a role in protecting not only the liberty of the accused, but also the entire citizenry from overzealous or overreaching state authority." (Citation omitted; internal quotation marks omitted.) *State* v. *Myers*, supra, 242 Conn. 140.

Although we are cognizant that the state "has a valid and weighty interest in convicting the guilty"; id., 140–41; and that the court has an interest in ensuring that justice is done and that the public is protected, the unique situation that the court found itself in in this case was largely the result of the state's handling of the initial October 2, 2019 hearing. Here, an anonymous tip came to the attention of the probation officer at the end of August, 2019. Between that time and the October 2, 2019 hearing, probation alerted the state of the information it had, and, if necessary, the state could have asked the court for a continuance of the hearing to investigate further and confirm the allegations. That did not happen. Instead, the state, in opposing the dismissal of the defendant's charges, chose to rely solely on the negative final report and the letter appended thereto, which contained only unsubstantiated allegations of potential contacts with minors and one admitted failure to report as the sole basis to support the contention that the defendant unsatisfactorily completed the diversionary program. The state did not provide affidavits from the various YMCA employees who had provided information to the probation officer. It did not obtain or submit copies of the employment applications allegedly executed by the defendant or other corroborating evidence. It did not request the opportunity to question under oath the witness relied on by defense counsel in his argument and who was present in the courtroom during the October 2, 2019 hearing. Moreover, the state has not lost its ability to prosecute the defendant with respect to any actions that he took while participating in the program that may constitute violations of his terms of release or new crimes.

VI
CONCLUSION

On the basis of the preceding discussion and our consideration of the arguments of the parties, we conclude that once the criminal court rendered a final judgment dismissing all charges in the present case it lost jurisdiction over the matter and could not properly entertain, let alone grant, a motion to open and restore the matter to the criminal docket. Rather than attempting to provide a legal basis for its exercise of power over the state's motion to open, the court indicated that it was opening its prior dismissal because it believed it was simply "wrong" that it had relieved the defendant of criminal liability on the basis of erroneous information. Such an outcome, however, is always a possibility in the adjudication of criminal matters. There is always a possibility that a defendant will be acquitted or have charges dismissed following which the state may uncover new information or previously uncovered proof, or the court may receive information that a witness gave false testimony or that material facts were other than what were presented to the court or a jury. Such possibilities do not in and of themselves confer jurisdiction on a court once that jurisdiction is lost following a final disposition of a criminal matter.

Similarly misguided was the court's suggestion that its ruling was akin to a clerical error for which it had the inherent authority to correct. A "clerical error" is an error in the recording of the judgment such that the judgment recorded does not reflect the judgment that the court actually rendered. Here, there is no question that, on the basis of the facts as presented, the court intended to grant a judgment of dismissal, and the record duly reflects that exact judgment. Any error existing in the present case was not "clerical" in nature but instead involved how the matter was adjudicated before the court.

The court made a reasoned determination on the facts presented that, contrary to the opinion of the Court Support Services Division and the state, the defendant had completed satisfactorily the diversionary program. It did so on the basis of the evidence before it and the arguments presented by the parties, including the representations made by defense counsel that went unchallenged despite later proving to be, at least in part, untrue. In accordance with § 54-56*l*, the court dismissed all the pending criminal charges and the defendant was discharged unconditionally. The state never indicated on the record any intention to appeal the court's decision, and, therefore, the defendant left the hearing with a well-founded belief that his interactions with the criminal court regarding this case had concluded. The fact that the state later came into possession of better or more convincing evidence that, if presented to the court at the October 2, 2019 hearing, likely would have changed the court's calculus and, therefore, its decision did not confer power on the court to enter-

tain a motion to open the judgment of dismissal.

At the time the motion was filed, the court had disposed of the criminal matter and the defendant had been discharged from his obligations under the program with the understanding that his criminal charges were no longer hanging over his head. The only available means for the state to overturn the court's decision was through the appeal process, which it elected not to pursue. Because we conclude that the court lacked the power to consider the state's motion to open, the judgment granting the motion must be reversed.[21]

The judgment is reversed and the case is remanded with direction to dismiss the state's motion to open.

In this opinion, ALEXANDER, J., concurred.

[1] General Statutes § 54-56*l* provides in relevant part: "(a) There shall be a supervised diversionary program for persons with psychiatric disabilities . . . .

\* \* \*

"(e) Upon confirmation of eligibility and consideration of the treatment plan presented by the Court Support Services Division, the court may grant the application for participation in the program. . . . The person shall be subject to the supervision of a probation officer who has a reduced caseload and specialized training in working with persons with psychiatric disabilities. . . .

"(g) Any person who enters the program shall agree: (1) To the tolling of the statute of limitations with respect to such crime or violation; (2) to a waiver of such person's right to a speedy trial; and (3) to any conditions that may be established by the division concerning participation in the supervised diversionary program including conditions concerning participation in meetings or sessions of the program. . . .

"(i) If such person satisfactorily completes the assigned program, such person may apply for dismissal of the charges against such person and the court, on reviewing the record of such person's participation in such program submitted by the Court Support Services Division and on finding such satisfactory completion, shall dismiss the charges. . . . Except as provided in subsection (j) of this section, upon dismissal, all records of such charges shall be erased pursuant to section 54-142a. An order of the court denying a motion to dismiss the charges against a person who has completed such person's period of probation or supervision or terminating the participation of a person in such program shall be a final judgment for purposes of appeal. . . ."

[2] According to the record, at the time he filed his application, the defendant already was participating in a supervised diversionary program in a separate case with respect to charges of larceny in the third and fourth degrees.

[3] The state argued at the hearing that at the time the program was granted in 2017, among the conditions imposed were that the defendant was "not to volunteer with minors, and not to go near schools and parks, that's to keep the defendant away from minor children." After recounting the factual allegations underlying the charges pending against the defendant, the state continued: "These are very serious allegations to which the defendant gets a dismissal. The complainant, the mother of the complainant wanted the defendant prosecuted to the fullest extent possible. This she said back in August of 2017, that this matter has significantly impacted the [complainant]. In hindsight, she said it was apparent that the defendant was grooming the [complainant] for sexual abuse. While the [complainant] has not disclosed sexual abuse, the mother of the [complainant] suspected that it had occurred or was about to occur, and she wanted to be informed with regards to any plea offers and dispositions with regards to this matter. She was also hoping that the defendant would not engage with any youth mentoring and/or work at the Boys and Girls Club.

"So that's the state's concern, and the letter that I got yesterday from Adult Probation in Waterbury was that on August 29th there was a call from an anonymous source. So I understand that Your Honor is going to take that into account that the source was anonymous, I get that, but the information was that the defendant had recently volunteered at a YMCA trip that

involved minors. The person was not specific as to which YMCA was involved. Through the course of the investigation, the officer wasn't able to verify this accusation because there was a limited amount of information, but the officer found that [the defendant] is not allowed to enter the Waterbury YMCA or the Torrington YMCA. The Plainville YMCA director was able to inform the officer that . . . this defendant had unsuccessfully applied for three separate employment positions as a camp counselor in March of this year. That's concerning. . . .

"The defendant was also directed to report to the Office of Adult Probation on September 18, 2019, and failed to do so. He is unlike someone who's been convicted and is on probation. We do see violation of probation warrants where a defendant is asked to report to the Office of Adult Probation and the warrant goes on for six pages saying how the defendant didn't report to Adult Probation. He's differently situated because [the defendant] gets a dismissal today if he's successful, and the state's claiming that he is not successful. Not only did he not report, but he wants to be a camp counselor. I don't want my kids going to the same camp as [the defendant] works . . . ."

[4] We note that the state did not file a motion for permission to appeal the court's judgment of dismissal or, more importantly, indicate any intent to appeal the court's ruling on the record. "[P]ursuant to General Statutes § 54-96, the permission of the trial court is a prerequisite to the right of the state in a criminal case to appeal . . . ." *State* v. *Bellamy*, 4 Conn. App. 520, 522, 495 A.2d 724 (1985); see also General Statutes § 54-96 ("[a]ppeals from the rulings and decisions of the Superior Court, *upon all questions of law arising on the trial of criminal cases*, may be taken by the state, *with the permission of the presiding judge*, to the Supreme Court or to the Appellate Court, in the same manner and to the same effect as if made by the accused" (emphasis added)). Although the judgment of dismissal was not a result of a criminal trial, we will presume for the sake of this discussion that the state nevertheless had a right to appeal from the judgment of dismissal, although such a right is not expressly provided for in § 54-56*l*.

Following a judgment of acquittal, the state must indicate *at the time of judgment* whether it intends to seek permission to appeal "so that the accused shall not be forthwith discharged. The evil perceived in granting a tardy request of the state to appeal was *the injustice of dragging back into court a defendant who had reasonably assumed that his discharge meant that he was a free man no longer charged with a crime*." (Emphasis added; internal quotation marks omitted.) *State* v. *Ross*, 189 Conn. 42, 46, 454 A.2d 266 (1983), citing *State* v. *Carabetta*, 106 Conn. 114, 119, 137 A. 394 (1927). "It is not necessary that the prosecutor shall at the moment of judgment reach a final determination that he will prosecute the appeal. It is necessary that he determine at the time of the judgment that he ought to ask the court for permission to take such appeal, so that the accused shall not be forthwith discharged; to that he is entitled unless the prosecutor shall move for such permission. If permission be granted, he will not be entitled to discharge until the appeal has been determined in his favor, or withdrawn." *State* v. *Carabetta*, supra, 119.

To the extent that following a final disposition of criminal charges in favor of a defendant, whether by acquittal or unconditional dismissal of charges, a criminal court arguably retains some jurisdiction to act postjudgment in the event that the state seeks permission to appeal, that jurisdictional window is a narrow one and necessarily closes if the state fails timely to invoke it. In the present case, because the state filed a "motion to reopen dismissal" and failed to signal any intent to appeal pursuant to § 54-96 at the time the court granted the judgment of dismissal, it is unnecessary at this juncture to determine either the scope or the duration of any continuing jurisdiction that might flow from such a request. Nonetheless, it must be noted that the "right of the [s]tate to appeal in criminal cases . . . did not exist at common law and was first given by the statute of 1886 [Public Acts 1886, c. XV], with the permission of the presiding judge . . . in the same manner and to the same effect as if made by the accused." (Internal quotation marks omitted.) *State* v. *Carabetta*, supra, 106 Conn. 115. Accordingly, there appears to be no basis for finding any continuing common-law jurisdiction flowing from the mere fact that the state had a right to appeal from the judgment.

[5] The addendum confirmed the gravamen of representations that defense counsel made at the October 2, 2019 hearing in response to the probation officer's original letter indicating in part that the defendant had failed to appear for his final probation appointment and that probation was unaware

of the defendant's whereabouts. Specifically, the addendum provided that the defendant met with the officer on October 1, 2019. At that time, the defendant explained that he had forgotten about the last appointment and reported that he was living in East Hartford and was attending Goodwin College. The addendum also indicated that the defendant had become "agitated and refused to have a civil conversation about the negative report submitted to the court," at which point, the officer asked the defendant to leave the office.

[6] The report contains a paragraph detailing the following new information that the officer claims he was able to confirm "on [October 2, 2019], through the investigative efforts of this officer . . . ." The defendant had worked as a camp counselor at Camp Onseyawa in upstate New York from August 12 to August 16, 2019. The camp's website provides in relevant part that the mission statement of the camp is to "provide a camping experience for 8-16 year old children with disabilities . . . ." The officer positively identified the defendant as attending a camp session from a video posted on the Internet in which the defendant was "surrounded by children and, at one point, he ha[d] a minor child on his back in a playful manner." A camp director confirmed that he was an employee of the camp but was sent home for his "inappropriate behavior with campers." The director, in describing this behavior to the officer, purportedly indicated that the defendant " 'had trouble separating himself from behaviors of the campers' " and that " '[a]t one point he was frustrated and was screaming at the kids that he hated them.' "

[7] The court's complete ruling was as follows: "All right. The court is going to rule as following: I don't have every case in front of me right now. I just have [the defendant's]. And the court will indicate and put two things into exhibits at this time. One is a report dated October 1, 2019, from the Office of Adult Probation indicating the defendant missed an appointment. Also I have before me, and this is a five page letter from the Office of Adult Probation dated October 4, [2019], to Rebecca Barry, supervisory assistant state's attorney for the state's attorney's office at G.A. 5 in Derby. The defendant—it's a letter from the Office of Adult Probation indicating the defendant was told on repeated times not to have any contact with minors. And on August 29, [2019], the office received information from a reliable confidential source who indicated he had volunteered—the defendant had volunteered at a YMCA trip [for] minors. In fact, although it was represented to me that he had never—that he—that the defendant had applied for a YMCA job, it was for adults, this indicates the complete opposite, that is, the defendant applied for positions and did not get them with regards to camp counselor that involved minors.

"In addition, this has information with regards to the camp in which the defendant worked at in Geneva, New York. And I should say the camp's website is, the mission of the camp is to provide a camping experience for eighteen—eight to sixteen year old children with disabilities from the four county area and to foster independence, acceptance, and others through social, recreational, and educational aspects of life. I had received that day of the dismissal a film clip indicating the defendant worked at that particular camp.

"And I, look, I don't know a lot about subject matter jurisdiction. I know I looked at the cases that the state has provided with and none of them seem to be quite on point. But I also know what the right thing to do is. And the right thing to do in this particular case is to reopen this case and have the defendant—and I say and have the defendant face the charges. I say that because this dismissal was granted under erroneous grounds. The dismissal was false, with false information. And, counsel, nobody has put any dispersions to you on there, but I—and I'm not going to ask for—elicit a response, but it is wrong. It is wrong the defendant received a dismissal. Just as if it was a clerical error, I will say this was an error in that I had none of this information before me.

"And, you know, this isn't an operating under suspension. The public policy, I mean, involved here is more significant to that. The defendant was, specifically, was told that he could not work or be around minors, yet he worked for—at a camp that had in its mission statement to work with children between the ages of eight to sixteen with emotional or physical disabilities. So what the defendant did was just commit a complete lie upon this court and he should not benefit from that.

"Like I said, I'm not quite sure about where I stand subject matter jurisdiction-wise and an appellate or higher court may tell me otherwise. And, typically, I stand before groups and say I'm no trail blazer with regards to

the law, but this is the right thing to do because I was provided all the wrong information at the very day that it was to be dismissed. So this could be placed on the jury list."

[8] The court stated at the start of the hearing that it believed it had dismissed the defendant's charges "under false pretenses that the defendant was in compliance when, boy, not only was he not in compliance, he couldn't have been any further away from compliance. . . . I'm a little angered because it really stings—it hurts that such a misrepresentation—*and, counsel, I'm not faulting you, you went with the information you had with you at the time*—but it was not even close to being accurate or truthful." (Emphasis added.) It is implicit in the court's statement that the court did not believe that defense counsel intentionally provided inaccurate information to the court with the goal of perpetrating a fraud on the court. Because the court's focus was on the representations by defense counsel, it failed to acknowledge in its analysis that the state presented no evidence to contradict the arguments of defense counsel, did not ask to examine the defendant's father under oath, and failed to request a continuance to verify the anonymous information or produce additional evidence to support its objection to the dismissal. As a result, there was no evidence before the court to find that a fraud had been perpetrated on the court at the time of the dismissal on October 2, 2019.

[9] General Statutes § 54-56*l* (i) provides in relevant part that an order denying dismissal of criminal charges "against a person who has completed such person's period of probation or supervision" is "a final judgment for purposes of appeal." In the present case, by virtue of its granting of the state's motion to open, the court effectively denied dismissal of the defendant's criminal charges. Accordingly, we conclude that the present appeal is properly before us.

[10] We find no merit in the state's argument that the defendant failed to preserve his claim because he framed his argument before the trial court as one challenging the court's subject matter jurisdiction whereas, on appeal, he now challenges only the court's authority to act, which, according to the state, is an entirely new and distinct claim. We construe the defendant's claim before the trial court and this court to argue more generally that the court lacked any power to open the judgment of dismissal, whether for want of jurisdiction or lack of statutory authority. Accordingly, we are unconvinced that we should decline to review the defendant's claim on the ground that he failed to preserve it properly before the trial court.

[11] Whether this common-law rule applied equally in civil and criminal matters is not discussed in *Wilson*, although we note that the court's discussion of the rule cites only to civil cases. Moreover, the discussion in *Wilson* lacks clarity about whether the "jurisdiction" lost by the court at common law following the expiration of the term was subject matter jurisdiction or personal jurisdiction. *State* v. *Wilson*, supra, 199 Conn. 436–37. If the court lost subject matter jurisdiction, presumably the party could not resuscitate it through waiver or consent. See *A Better Way Wholesale Autos, Inc.* v. *Saint Paul*, 338 Conn. 651, 662, 258 A.3d 1244 (2021) ("a subject matter jurisdictional defect may not be waived . . . and . . . subject matter jurisdiction, if lacking, may not be conferred by the parties, explicitly or implicitly" (internal quotation marks omitted)). It is also possible that the term "jurisdiction" was used loosely as a means of describing only the court's authority to act rather than any real limit on its jurisdiction.

[12] The dissenting opinion, rather than seeking to determine when, under our common law, a court's jurisdiction over a criminal matter ends, instead frames the issue as one "pertaining to the court's *retention* of jurisdiction . . . ." (Emphasis added.) The dissent seems to conclude that the common-law rule is that a court of general jurisdiction retains that jurisdiction indefinitely and that, because this purported rule has not been expressly superseded or abrogated by statute or decisional law, it remains applicable. *Sanford* v. *Sanford*, 28 Conn. 5, 14 (1859), the principal authority of our Supreme Court relied on by the dissenting opinion as support for the proposition that, under the common law, " 'jurisdiction continues to exist in full force' " and is somehow retained indefinitely, does not bear the weight that the dissenting opinion places on it. Indeed, the Supreme Court in *Sanford* explicitly stated that, to the contrary, a court retains jurisdiction over a cause only "until the case should be finally determined." Id. We read *Sanford* as supporting our conclusion that a court's jurisdiction over a criminal matter generally ends—or, in *Sanford*'s parlance, is "exhausted"; id.;—following a final disposition of the criminal charges. Moreover, *Sanford* is not a criminal case. It did not involve the question of whether, under the common law, a

court exercising criminal jurisdiction retains that jurisdiction after it dismisses an action.

[13] The limited and continuing jurisdiction of criminal courts to hear post-sentencing motions to correct an illegal sentence, as set forth in Practice Book § 43-22, arises from the common-law rule that a trial court has the power to modify a sentence, even after its imposition, if that sentence is invalid. See *State* v. *Lawrence*, 281 Conn. 147, 155, 913 A.2d 428 (2007).

[14] In *State* v. *Johnson*, supra, 301 Conn. 634, the defendant was charged in four separate cases, two involving misdemeanor charges, one involving a felony charge and the last involving a violation of probation. He was found incompetent to stand trial and not restorable to competency. Id. He subsequently filed a motion to dismiss the charges in all four cases, arguing with respect to the misdemeanor charges and the violation of probation case that, pursuant to General Statutes § 54-56d (m) (5), the court was required to dismiss " 'with or without prejudice, any charges for which a nolle prosequi is not entered when the time within which the defendant may be prosecuted for the crime with which the defendant is charged . . . has expired . . . .' " Id., 637–38. He further argued that, with respect to the felony charge, for which the statute of limitations had not yet run, he was entitled to a dismissal because of "[i]nsufficiency of evidence or cause to justify the bringing or continuing of such information or the placing of the defendant on trial . . . ." Practice Book § 41-8 (5); see also *State* v. *Johnson*, supra, 638. The trial court concluded that § 54-56d (m) (5) did not apply because "his crimes had not resulted in the death or serious injury of another person," but it granted the defendant's motion and dismissed all charges *without prejudice* on the alternative ground that it lacked personal jurisdiction over the defendant once he was found incompetent and not restorable to competency. *State* v. *Johnson*, supra, 635. Unlike in the present case, the state appealed the dismissal of the charges. Id.

In support of its motion to open, the state in the present case provided a pinpoint cite to a portion of the *Johnson* opinion analyzing the defendant's argument that the state was not aggrieved by the dismissal of the charges without prejudice and, thus, lacked standing to appeal. See id., 642–43. In *Johnson*, our Supreme Court agreed in part and rejected in part that argument, the resolution of which turned on whether the state could reinstitute the particular charges. Id., 643. The pinpointed portion of the analysis provides as follows: "A dismissal without prejudice terminates litigation and the court's responsibilities, while leaving the door open for some new, future litigation. . . . It is well established that a dismissal without prejudice has no res judicata effect on a subsequent claim. . . . Accordingly, [t]he granting of a motion to dismiss without prejudice . . . does not preclude the state from charging the defendant in a new information with the same offenses within the applicable statute of limitations." (Citation omitted; emphasis omitted; internal quotation marks omitted.) Id. In other words, the issue in *Johnson* was the limits of the state's authority to bring new charges. Nothing in this analysis is germane to whether a criminal court has the power to entertain a motion to open a judgment of dismissal. Moreover, unlike the present case, the court's dismissal of the charges in *Johnson* was expressly without prejudice. Id., 638.

*Tyson* v. *Commissioner of Correction*, supra, 155 Conn. App. 97, was a habeas appeal in which the petitioner challenged the habeas court's dismissal of his habeas petition. The state in the present case, in citing to *Tyson* in support of it motion to open the judgment of dismissal, provided a pinpoint cite to a section of the opinion in *Tyson* in which the appellate court determined that it lacked subject matter jurisdiction over a portion of the appeal because the petitioner was not aggrieved by the habeas court's dismissal, which was effectively without prejudice. See id., 105. The pinpointed page contains a portion of the same boilerplate language quoted in *Johnson*. Id. Like *Johnson*, it is entirely unclear how the quoted language supports the position advanced by the state in the present case, particularly given the markedly distinct factual and legal postures involved.

Finally, *State* v. *O'Bright*, supra, 13 Conn. App. 733–34, was a case in which the trial court had dismissed an earlier information on the ground that the affidavit submitted in support of the arrest warrant failed to establish probable cause. The court did not expressly state whether that dismissal was with or without prejudice as it was required to do at the time under a rule of practice since repealed. Id., 734. After the state filed a new information, the court granted the defendant's motion to dismiss the new information with prejudice, concluding that the trial court's prior dismissal also had been intended to be with prejudice. Id. "The sole issue on appeal [was]

whether a trial court order purporting to dismiss an information and discharge the defendant was a dismissal with prejudice that would preclude reprosecution . . . for the same offense." Id., 733. This court concluded that it did not bar reprosecution and reversed. Id., 735–36. Like *Johnson*, the opinion in *O'Bright* does not address a trial court's authority to set aside or open a judgment of dismissal but implicates only the limits of the state's authority to bring new charges following a dismissal, which is not the issue before us.

[15] "A petition for a new trial is properly instituted by a writ and complaint served on the adverse party; although such an action is collateral to the action in which a new trial is sought, it is by its nature a distinct proceeding." (Internal quotation marks omitted.) *State* v. *Myers*, supra, 242 Conn. 135.

[16] The state and the dissenting opinion seek to establish different limitations on the power of the criminal court based on the manner in which a criminal matter terminates. We can conceive of no compelling rationale why the four month rule does *not* apply to a judgment that became final on imposition of a sentence but should apply to a judgment terminated by the dismissal of charges. In both instances, there has been a complete and final resolution of the information on which the criminal court's jurisdiction is founded. See *State* v. *Daly*, supra, 111 Conn. App. 401–402. The state's argument is no more persuasive than the one advanced by the defendant in *State* v. *Falcon*, 84 Conn. App. 429, 435, 853 A.2d 607 (2004), overruled on other grounds by *State* v. *Das*, 291 Conn. 356, 968 A.2d 367 (2009), which this court squarely rejected. The defendant in *Falcon*, who challenged the court's dismissal for lack of jurisdiction of his postsentencing motion to withdraw his plea, argued that the trial court never "relinquished jurisdiction because he never was transferred to the custody of the [C]ommissioner of [C]orrection" and a criminal court's jurisdiction ended only "when a prisoner is taken into the custody of the [C]ommissioner of [C]orrection." *State* v. *Falcon*, supra, 430, 434–35. The court rejected the defendant's reasoning, noting that, if true, "a final judgment would be limited to cases in which a defendant was sentenced to incarceration and would preclude finality with the imposition of a suspended sentence, probation, conditional or unconditional discharge, or the imposition of a fine. Such a construction would undermine the societal interest in the finality of judgments, and the defendant's position is therefore impracticable." Id., 435. This reasoning supports our recognition of a rule linking a criminal court's power to act to the *finality* of the judgment rendered rather than to the *type* of judgment rendered.

[17] The dissenting opinion incorrectly states that "[t]he majority does appear to recognize that the court could exercise jurisdiction if its judgment had been procured by fraud but dismisses this possibility on the basis that the court did not find that its judgment had been fraudulently procured." We do not. We, in fact, leave any such recognition for another day and merely assume arguendo that it applies, having found no case in which the fraud on the court exception has been applied in the criminal context. The dissenting opinion cites to none.

[18] The dissenting opinion acknowledges that the court made no explicit finding of fraud or any intent to deceive. Nevertheless, it states that the "record does support a determination that in granting the [state's] motion [to open] the court made *a unilateral mistake induced by the misrepresentations of counsel*." (Emphasis added.) We are not clear what standard the dissenting opinion is invoking by this statement. Nevertheless, it remains that the representations made by counsel to the court, even if they later proved to be factually inaccurate in whole or in part, cannot properly be labeled "misrepresentations" without a finding that counsel had some intent to deceive or obfuscate, a factual finding that is not a part of the record and cannot be made by this court on appeal. If a mistake was made in this case, it was the failure of the state, prior to dismissal, to seek to put on evidence of the defendant's alleged noncompliance with the terms of the diversionary program or to request a continuance to investigate further.

[19] The dissenting opinion suggests that policy considerations have no valid place in our consideration of the jurisdictional question before us. We disagree. In ascertaining whether the court had jurisdiction in the present case to open the judgment of dismissal, we are required to analyze existing common-law precedent and relevant statutes and provisions of our rules of practice, none of which clearly answers the question posed by this case. Policy considerations, therefore, are relevant in interpreting the scope and significance of these legal authorities. In other words, just as we would consider existing public policy in framing or ascertaining common-law rules; see *Demond* v. *Project Service, LLC*, 331 Conn. 816, 848, 208 A.3d 626 (2019);

it is appropriate for this court to consider relevant public policy interests, including those underlying our finality of judgment jurisprudence, particularly in a criminal case.

[20] Significantly, the erasure statute provides not just for the erasure of records but that "[a]ny person who shall have been the subject of such an erasure shall be deemed to have never been arrested within the meaning of the general statutes with respect to the proceedings so erased and may so swear under oath." General Statutes § 54-142a (e) (3).

[21] To the extent that the dissenting opinion's final footnote implies that the majority takes "a dim view of the wisdom and discretion of the trial bench," that is certainly not the case. To the contrary, we recognize that the trial bench generally, and certainly the judge in this particular case, attempts to exercise its authority in a reasoned manner with the interests of the parties and justice in mind. Whether a court has jurisdiction to act under a given set of circumstance, however, does not turn on the seriousness of the underlying charges but on whether the court has authority to act.

_____