STATE OF CONNECTICUT *v.* CARLTON BUTLER
(SC 20702)

Robinson, C. J., and McDonald, D'Auria, Mullins and Moll, Js.

*Syllabus*

The defendant appealed to the Appellate Court, challenging the trial court's
decision to grant the state's motion to open the judgment dismissing
certain criminal charges, including risk of injury to a child, that had
been filed against the defendant. The charges stemmed from an incident
in which the defendant allegedly had inappropriate contact with a twelve
year old child. After the charges were filed, the defendant applied for

State *v.* Butler

and was granted admission to a statutory (§ 54-56*l*) two year, supervised diversionary program for individuals with psychiatric disabilities, which would lead to dismissal of the charges following his successful completion thereof. As a condition to being admitted to the program, the defendant agreed that he would have no contact with minors, including in a volunteer or work capacity, and that he would not be present at any locations frequented by minors. Thereafter, the trial court received a report noting that the defendant had successfully completed the program, and it held a hearing to address the possible dismissal of the charges under § 54-56*l* (i). At that hearing, the prosecutor argued that the court should not grant a dismissal in light of a final progress report, issued by the Court Support Services Division, that indicated that the defendant had not satisfactorily completed the program, and in light of a letter from the defendant's probation officer that indicated that he received information from an anonymous source that the defendant had recently volunteered for an excursion sponsored by a local YMCA that involved minors. That letter also indicated that the defendant was not allowed to enter two local YMCAs due to certain undisclosed incidents and that he had unsuccessfully applied for employment positions as a camp counselor at a third local YMCA while he was participating in the program. That letter further indicated that the defendant had failed to report to his probation officer for a scheduled appointment. In response, defense counsel argued that, although the defendant did not appear for his most recent probation appointment, the allegations contained in the letter regarding volunteering at a YMCA and submitting YMCA employment applications had not been substantiated. Defense counsel also represented to the court that the defendant's father had informed him that the defendant, who did not have a license to operate a motor vehicle, relied on his father to drive him everywhere, that the defendant did not participate in a YMCA excursion as a volunteer, and that he had never driven the defendant to a YMCA to apply for employment. The trial court ultimately dismissed the charges against the defendant. The following day, the state filed its motion to open, claiming that it obtained new information and evidence demonstrating that the defendant had not successfully completed the diversionary program, including footage of the defendant working at a summer camp, and that the trial court, in dismissing the case, relied on representations made by defense counsel that had proven to be false. During the hearing on the motion, defense counsel stressed the court's lack of jurisdiction over the case following a dismissal under § 54-56*l* (i). The trial court granted the state's motion, concluding that it had erroneously dismissed the charges because its dismissal was based on false information. On appeal, the Appellate Court reversed the trial court's decision to grant the motion to open, concluding that the trial court improperly had granted the motion insofar as the trial court lost jurisdiction when it rendered its judgment of dismissal. The Appellate Court also concluded that it did not need to decide

State *v.* Butler

whether the civil rule that a trial court has intrinsic power to open a judgment obtained by fraud applies in the criminal context because, even if it did, the record did not support a finding that fraud was perpetrated on the trial court. On the granting of certification, the state appealed to this court. *Held*:

1. The Appellate Court correctly concluded that the trial court had lost jurisdiction when it dismissed the defendant's criminal charges and was therefore without jurisdiction to rule on the state's motion to open the judgment of dismissal:

   This court determined, after reviewing the record and the parties' briefs, and after considering oral argument, that the Appellate Court's reasoning and analysis were sound, and agreed with the Appellate Court's conclusion that the trial court was divested of jurisdiction when it rendered a final and unconditional judgment of dismissal.

   This court clarified that the statutory (§ 52-212a) "four month rule," which permits a trial court to retain jurisdiction over a civil judgment for a period of four months after the notice of judgment has been sent and to open that judgment during that four month period, is inapplicable in criminal cases.

   This clarification was based on this court's consideration of legislation passed in 1977, which served to modify a trial court's common-law authority to revise its judgments, the fact that § 52-212a pertains to "civil" judgments and the fact that the legislature had not enacted any similar provision authorizing a trial court to retain jurisdiction over a criminal judgment for a designated period of time following its rendering, and on this court's recognition that, in *State* v. *McCoy* (331 Conn. 561), it had determined that the common-law rule that a trial court's jurisdiction is lost upon the execution of a defendant's sentence remained viable law.

   Moreover, this court concluded that *State* v. *Wilson* (199 Conn. 417), in which the court held that the four month rule of § 52-212a applied to criminal judgments, was wrongly decided, and that particular holding in *Wilson* was overruled.

   In concluding that the trial court's judgment dismissing the defendant's criminal charges served to divest that court of jurisdiction to decide the state's motion to open, this court reasoned that a trial court's authority over a criminal case derives from the presentment of an information, that § 54-56*l* (i) ensures that a defendant's pending criminal charges will be dismissed upon his or her successful completion of the diversionary program authorized by § 54-56*l*, and that, when an information, which contains the charges and establishes the trial court's jurisdiction, is dismissed, the court's jurisdiction is extinguished because there exists no valid charging document to confer jurisdiction.

State *v.* Butler

Furthermore, this court observed that other jurisdictions have similarly concluded that a trial court is divested of jurisdiction and authority upon the dismissal of all criminal charges.

2. This court did not need to decide whether the civil rule permitting a trial court to open a judgment obtained by fraud applies in the criminal context insofar as the Appellate Court correctly concluded that the record in the present case did not support a finding of fraud or intentional misrepresentation.

(*One justice concurring separately*)

Argued February 23—officially released September 19, 2023

*Procedural History*

Information charging the defendant with the crimes of risk of injury to a child and breach of the peace in the second degree, brought to the Superior Court in the judicial district of Ansonia-Milford, geographical area number five, where the court, *Brown, J.*, granted the defendant's application to participate in a statutorily authorized diversionary program; thereafter, the court, *McShane, J.*, rendered judgment dismissing the information; subsequently, the court, *McShane, J.*, granted the state's motion to open the judgment of dismissal, and the defendant appealed to the Appellate Court, *Prescott* and *Alexander, Js.*, with *Bishop, J.*, dissenting, which reversed the trial court's judgment and remanded the case with direction to dismiss the state's motion to open, and the state, on the granting of certification, appealed to this court. *Affirmed.*

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, were *Margaret E. Kelley*, state's attorney, *Rebecca A. Barry*, supervisory assistant state's attorney, and *Mary A. SanAngelo*, senior assistant state's attorney, for the appellant (state).

*Emily H. Wagner*, assistant public defender, for the appellee (defendant).

*Opinion*

McDONALD, J. This certified appeal requires us to decide, as a matter of first impression, whether a crimi-

State *v.* Butler

nal court has inherent common-law jurisdiction to open a judgment of dismissal following the defendant's completion of a supervised diversionary program within four months of the date it was rendered. We are also asked to decide whether the trial court has the authority to open the same judgment of dismissal if that judgment was the result of purported misrepresentations to the court. We conclude that criminal courts do not have jurisdiction to open a judgment following a dismissal. We also decline to reach the second certified question because the trial court made no findings of misrepresentations in the present case.

The defendant, Carlton Butler, was arrested in 2017 on charges of risk of injury to a child and breach of the peace in the second degree. The charges arose from an incident at a McDonald's restaurant in Derby involving inappropriate conduct between the defendant and a twelve year old child. In August, 2017, the defendant filed an application to participate in a supervised diversionary program for individuals with psychiatric disabilities. The trial court canvassed the defendant on the conditions imposed on him while participating in the diversionary program, which included that he have no contact with minors, including in a volunteer or work capacity, and that he not go to any areas frequented by minors. The defendant indicated that he was willing to abide by all of the conditions. The court subsequently granted the application.

In the early stages of the two year supervised diversionary program, the defendant struggled with the program's mental health and counseling requirements, which became the subject of several court hearings. Due to the defendant's failure to regularly attend the court-mandated counseling sessions, the defendant was enrolled in an alternative program with the Sterling Center, which the trial court described as more rigorous than the initially designated program. In June, 2019, the

State *v.* Butler

court indicated that it received a report noting that the defendant successfully completed his sessions at the Sterling Center. The court congratulated the defendant on his success and the "great letter" it received, and continued the case to October 2, 2019, for possible dismissal under General Statutes § 54-56*l* (i), which provides for the dismissal of pending charges following the successful completion of a pretrial supervised diversionary program.

On September 25, 2019, the Judicial Branch Court Support Services Division issued a final progress report, which indicated that the defendant had not satisfactorily completed the assigned diversionary program. Attached to the report was a letter from the defendant's probation officer. The attached letter stated that the probation officer received information from an anonymous source that, in August, 2019, the defendant volunteered for a YMCA trip involving minors. The letter indicated that the Office of Adult Probation was unable to verify the accuracy of the information provided by the anonymous source. The letter further indicated that the probation officer found that the defendant was not allowed to enter the Waterbury and Torrington YMCAs due to "separate, undisclosed incidents" and that the Plainville YMCA director informed the officer that the defendant "unsuccessfully applied for three separate employment positions as a 'camp counselor' on [March 15, 2019]." Lastly, the letter noted that the defendant failed to report to his probation officer on September 18, 2019. There was nothing appended to the letter to substantiate these allegations.

From September 25, 2019, until the defendant's October 2, 2019 hearing, the Office of Adult Probation did not provide any further support or details regarding the information in the letter. On October 2, 2019, the trial court held a hearing to determine whether it would dismiss the charges against the defendant. The prosecu-

State *v.* Butler

tor argued that the court should not grant a dismissal because of the statements and allegations contained in the September 25 letter attached to the final progress report. In response, defense counsel argued that the allegations contained in the letter regarding volunteering at a local YMCA and submitting YMCA job applications had not been substantiated.

Defense counsel also argued that "[the defendant] does not [have] a driver's license. He does not own a car. His father drives him everywhere. His father is present here in the courtroom and is willing to come up and talk to Your Honor. Your Honor, I talked to [the defendant's] father, who stated that [the defendant] has never gone on a YMCA trip as a volunteer. He's also indicated to me that he's never—they live in Waterbury. He's also indicated to me that he's never driven [the defendant] to the Plainville YMCA to apply for a job.

"Secondly, Your Honor, the reason why [the defendant] is not allowed at the YMCAs is because, prior to this case—prior to the supervised diversionary program being granted, he was going to the YMCA. While the case was pending, he was going to the YMCA. At that point, someone notified the YMCA of his arrest. They told him he was no longer allowed back. So, I found it concerning . . . that some of this information [in the September 25, 2019 letter] is very dated. Okay? And, secondly, based on his father's own representation to me, false.

"It's true, [the defendant] will admit that he did not go to his last probation meeting on September [18, 2019]. [The defendant] forgot about it. After two years, it's the one and only one he's ever missed. [The defendant] is attending Goodwin College; however, I know [the defendant] likes to tell people he's living in East Hartford, but, after speaking with his father, he still lives at home with his father. His father drives him to

State *v.* Butler

Goodwin College. I know, in chambers, Your Honor, I had indicated that [the defendant] did apply for an adult counselor position, but that was through Easterseals; that was not through the YMCA. So, we don't even know if this YMCA application is [the defendant] himself. [The defendant's] father would probably tell Your Honor, because he's told me, that he's never driven [the defendant] to the Plainville YMCA. To [the father's] knowledge, [the defendant] has never applied to . . . the YMCA for anything. He's never, to his knowledge, ever went on a trip with minors. [The defendant's] only mode of transportation is through his father. He's never taken his father's car without permission. [The defendant] doesn't own a car. He doesn't have a driver's license. . . . Your Honor, so, essentially, the only thing that is a fact and is true is that [the defendant] missed his last probation meeting on [September 18, 2019]; however, the probation officer left a card for [the defendant] to go on [October 1, 2019]. . . .

"I think, up to [this] point, Your Honor, [the defendant] has fulfilled everything on the supervised diversionary program. He paid for the Sterling Center out of pocket. He's on disability. It was a financial hardship for him and his father. The allegations of [his] going to the YMCA during the pendency of [his] being [in] the supervised diversionary program is unfounded . . . and refuted by the only person he can get a ride from. For those reasons, Your Honor, I think [the defendant] should have a successful dismissal on this program."

After hearing arguments from both parties, the trial court proceeded to articulate its ruling dismissing the charges against the defendant: "[W]hat the court has before it is an individual who missed his last appointment, and the fact that this case has been pending since [June, 2017], with no arrests certainly speaks in the defendant's behalf. I certainly understand the state's concern with [regard] to the defendant working as a

State *v.* Butler

camp counselor, but I am concerned [with] the fact that this was an anonymous tip that was not looked into by the Office of Adult Probation, other than just to receive it without making phone calls. It doesn't appear as though any of it is, in fact, true. The defendant had numerous appointments during the way, he had his bumps along the way and ended up making those. You know, it's something that he applied for back on [October 2, 2017], with the understanding that, if he did what he was supposed to do, [the case] would be dismissed. He did what he was supposed to do. The case is therefore dismissed.''

The next day, the state filed a motion to open the judgment of dismissal, claiming that information had come to the state's attention following the judgment of dismissal that demonstrated that the defendant did not successfully complete the supervised diversionary program. It argued that the trial court relied on representations made by defense counsel that had proven to be false. The state also asserted that there was footage of the defendant working at a summer camp in Massachusetts that was taken during the summer of 2019. The state indicated that the Office of Adult Probation would provide a more detailed report as to the noncompliance. As to the trial court's authority to open the case, the state argued that the court had jurisdiction under *State* v. *Johnson*, 301 Conn. 630, 643, 26 A.3d 59 (2011), *Tyson* v. *Commissioner of Correction*, 155 Conn. App. 96, 105, 109 A.3d 510, cert. denied, 315 Conn. 931, 110 A.3d 432 (2015), and *State* v. *O'Bright*, 13 Conn. App. 732, 733, 539 A.2d 161 (1988).[1]

---

[1] Although the state cited these cases in its initial motion to open, it did not reference these cases on appeal to this court. The trial court noted in its oral ruling that none of the cases was on point. The Appellate Court further concluded that "the record contains no argument by the state regarding how these cases are instructive, and, without the benefit of such input, we are left to agree with the assessment of the trial court and the defendant that these cases are inapposite to the issue before us." *State* v. *Butler*, 209 Conn. App. 63, 87, 267 A.3d 256 (2021). We agree that the cases are not

State *v.* Butler

The defendant objected to the motion, arguing that the cases relied on by the state were not pertinent to the trial court's consideration of whether it could open the dismissal of the criminal charges. He also argued that granting the motion to open would be against public policy and would set a dangerous precedent that is particularly troublesome under these circumstances because a defendant who is enrolled in a diversionary program must agree to the tolling of the statute of limitations with respect to his underlying crimes in order to participate. Therefore, the defendant argued, granting the motion to open would endanger all current and past defendants who used a diversionary program and whose crimes are within the statute of limitations.

The trial court held a hearing on the state's motion to open on October 15, 2019, at which the court entered as court exhibits (1) an "addendum" to the September 25, 2019 letter,[2] and (2) a five page report from the defendant's probation officer dated October 4, 2019, which detailed the officer's supervision of the defendant during the diversionary program and noted the officer's concern that the defendant "continues to seek contact with minors and actively engages in deceptive behavior to conceal such contact." The letter further stated that, "[u]nfortunately, this officer was unable to communicate this information to the [c]ourt prior to the dismissal of the [s]upervised [d]iversionary [p]rogram due to the [time frame] of the information being confirmed."

instructive, and they were not raised in this appeal, and, therefore, we do not address them further.

[2] The addendum confirmed the representations that defense counsel made at the October 2, 2019 hearing regarding the defendant's failure to appear for his probation appointment. Specifically, the addendum provided that the defendant met with the probation officer on October 1, explained that he had forgotten about the last appointment, and reported that he was living in East Hartford and was attending Goodwin College. The addendum also indicated that the defendant had become "agitated and refused to have a civil conversation about the negative report submitted to the [c]ourt." Accordingly, the probation officer asked the defendant to leave the office.

State *v.* Butler

At the hearing, the trial court noted that it "based its decision to dismiss this [case] on information that was incorrect, was totally contradictory . . . and I would assert . . . that I did it under false pretenses. I dismissed this under false pretenses that the defendant was in compliance when . . . not only was he not in compliance, he couldn't have been any further away from compliance." It also indicated to defense counsel that it was "a little angered" by the representations made to the court but that it did not fault counsel because counsel "went with the information [he] had . . . at the time" and that the information later proved to be inaccurate.

Both parties then presented argument on the issue of opening the judgment. The prosecutor focused her argument on the "material misrepresentation[s]" made to the trial court that concerned the specific conditions of the defendant's program compliance. Defense counsel's argument in objection stressed the lack of the court's jurisdiction over the case following a dismissal under § 54-56*l* (i). Defense counsel also argued that he represented to the court only the information he knew and that the allegations he refuted were a YMCA trip and applying to the Plainville YMCA and that those allegations were never substantiated. Lastly, defense counsel reiterated how harmful this precedent would be to other defendants who engage in diversionary programs and that this situation is "bigger than [the defendant]" and "endangers any and all participants in [a diversionary program]."

The trial court proceeded to grant the state's motion to open the judgment of dismissal, noting that the dismissal was "erroneous" and stating on the record: "I don't know a lot about subject matter jurisdiction. I know I looked at the cases that the state has provided [the court] with, and none of them seem[s] to be quite on point. But I also know what the right thing to do is.

State *v.* Butler

And the right thing to do in this particular case is to [open] this case and have the defendant . . . face the charges. I say that because this dismissal was granted [on] erroneous grounds. The dismissal was false, with false information. And, counsel, nobody has put any [aspersions on] you . . . and I'm not going to ask for— elicit a response, but it is wrong. It is wrong [that] the defendant received a dismissal. Just as if it was a clerical error, I will say this was an error, in that I had none of this information before me.'' The court did not make any express finding that the state had established, by clear and convincing evidence, intentional misrepresentations by defense counsel to the court.

The defendant appealed to the Appellate Court from the trial court's decision to open the judgment, claiming that the trial court lacked jurisdiction to open and set aside the unconditional dismissal of his charges following his completion of the supervised diversionary program and that, in doing so, it deprived him of liberty and finality of judgment interests. See *State* v. *Butler*, 209 Conn. App. 63, 79, 267 A.3d 256 (2021). The state argued in response that the trial court possessed subject matter jurisdiction to open a case following a dismissal. Id. The Appellate Court agreed with the defendant and concluded that the trial court lost jurisdiction over the matter when it rendered the judgment of dismissal. Id., 79–80. Therefore, the Appellate Court concluded that the trial court improperly granted the state's motion to open. Id., 80.

The Appellate Court began its analysis by reviewing the original common-law rules regarding jurisdiction, under which ''a trial court possesses the inherent power to modify its own judgments during the term at which they were rendered''; (internal quotation marks omitted) id., 81; and that ''a trial court has the discretionary power to modify or vacate a criminal judgment *before the sentence has been executed.*'' (Emphasis in original;

State *v.* Butler

internal quotation marks omitted.) Id., 83. Additionally, it noted that "[n]o statutory provisions exist . . . that expand the existing common-law jurisdiction of our criminal courts or expressly permit a court to reinstate criminal charges after it has dismissed them." Id.

The Appellate Court surveyed a line of cases from this court dealing with the "four month rule" set forth in General Statutes § 52-212a,[3] which permits a trial court to retain jurisdiction over a civil judgment for a period of four months after the notice of the judgment was sent. Id., 84–94. The Appellate Court acknowledged this court's decision in *State* v. *Wilson*, 199 Conn. 417, 513 A.2d 620 (1986), in which this court concluded that the four month rule applied to criminal matters, as well as civil. See *State* v. *Butler*, supra, 209 Conn. App. 89–90; see also *State* v. *Wilson*, supra, 437. It also reviewed our subsequent decision in *State* v. *Myers*, 242 Conn. 125, 698 A.2d 823 (1997), in which this court cited *Wilson* as support for its observation that a criminal trial court retained jurisdiction to entertain a motion for a new trial, even after sentencing. See *State* v. *Butler*, supra, 90; see also *State* v. *Myers*, supra, 136 and n.16. The Appellate Court then explained that a more recent decision by this court, *State* v. *McCoy*, 331 Conn. 561, 206 A.3d 725 (2019), "fully abrogated in the context of final criminal judgments any application of the four month rule, which applies only in civil matters." *State* v. *Butler*, supra, 94; see *State* v. *McCoy*, supra, 586–87. Thus, the Appellate Court concluded that, "once the criminal court rendered a final judgment dismissing all charges in the present case, it lost jurisdiction over the matter and could not properly entertain, let alone grant, a motion to open and restore the matter to the criminal docket." *State* v. *Butler*, supra, 103–104.

—————

[3] Although § 52-212a has been amended since the events at issue in this appeal; see Public Acts 2021, No. 21-104, § 44; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

State *v.* Butler

The Appellate Court also considered whether a criminal court has inherent jurisdiction to modify a judgment obtained by fraud. The court acknowledged the existing civil rule that a trial court has intrinsic power to open a judgment obtained by fraud. Id., 94; see also, e.g., *Billington* v. *Billington*, 220 Conn. 212, 218, 595 A.2d 1377 (1991). It concluded, however, that "[i]t [was] unnecessary to decide at this juncture . . . whether this particular civil rule applies equally in the criminal context because, even [if it assumed], without deciding, that it does, [it was] unconvinced that the record in the present case would support a finding that a fraud, as opposed to a negligent misrepresentation, was perpetrated on the [trial] court."[4] (Footnote omitted.) *State* v. *Butler*, supra, 209 Conn. App. 94–95. The Appellate Court noted that, although the trial court likened its decision to dismiss the case to a "clerical error," it cannot be properly classified as one. Id., 104. "The [trial] court made a reasoned determination on the facts presented that, contrary to the opinion of the Court Support Services Division and the state, the defendant had completed satisfactorily the diversionary program. It did so on the basis of the evidence before it and the arguments presented by the parties, including the representations made by defense counsel that went unchallenged despite later proving to be, at least in part, untrue. . . . The fact that the state later came into possession of better or more convincing evidence that, if presented to the [trial] court at the October 2, 2019 hearing, likely would have changed the court's calculus and, therefore, its decision did not confer power on the court to entertain a motion to open the judgment of dismissal." Id., 104–105.

---

[4] The Appellate Court noted that, to open and vacate a civil judgment on the basis of fraud, a party must show that he was "diligent during trial in trying to discover and expose the fraud, and that there is clear proof of that fraud." (Internal quotation marks omitted.) *State* v. *Butler*, supra, 209 Conn. App. 95; see also, e.g., *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 107, 952 A.2d 1 (2008).

348 Conn. 51        SEPTEMBER, 2023              65

State *v.* Butler

Lastly, the Appellate Court noted the policy consider-
ations served by its conclusion, including the "signifi-
cant liberty and finality of judgment interests" that
attach by virtue of the trial court's granting of an uncon-
ditional judgment of dismissal and the fact that the
defendant, in agreeing to participate in the supervised
diversionary program, "gave up his right to defend
against the allegation leveled by the state and agreed
to be subject to numerous conditions in excess of those
imposed by the [trial] court as conditions of his release."
Id., 102. The Appellate Court acknowledged the state's
"valid and weighty interest in convicting the guilty";
(internal quotation marks omitted) id., 103; but also
emphasized that "the unique situation that the [trial]
court found itself in . . . was largely the result of the
state's handling of the initial October 2, 2019 hearing.
. . . [T]he state, in opposing the dismissal of the defen-
dant's charges, chose to rely solely on the negative final
report and the letter appended thereto, which contained
only unsubstantiated allegations of potential contacts
with minors and one admitted failure to report as the
sole basis to support the contention that the defendant
unsatisfactorily completed the diversionary program.
The state did not provide affidavits from the various
YMCA employees who had provided information to the
probation officer. It did not obtain or submit copies of
the employment applications allegedly executed by the
defendant or other corroborating evidence. It did not
request the opportunity to question under oath the wit-
ness . . . on [whom] defense counsel [relied] in his
argument and who was present in the courtroom during
the October 2, 2019 hearing. Moreover, the state has not
lost its ability to prosecute the defendant with respect
to any actions that he took while participating in the
program that may constitute violations of his terms of
release or new crimes." Id.

The dissenting Appellate Court judge disagreed with
the majority's characterization of the state of the law

State *v.* Butler

following *McCoy* and concluded that *Wilson* was, at least in part, still applicable law. See id., 110–11 (*Bishop, J.*, dissenting). In concluding that, when "no sentence has been imposed, a criminal court's jurisdiction to modify its judgment ends after a period of four months following judgment," the dissent implied that the trial court retained jurisdiction to modify its judgment notwithstanding the dismissal. Id., 110 (*Bishop, J.*, dissenting). Furthermore, although it agreed with the majority's conclusion that the trial court made no explicit findings of fraud, it characterized the court's comments as a reflection of the court's belief that it was "grossly misled"; id., 114 (*Bishop, J.*, dissenting); and "induced into an erroneous decision . . . ." Id., 115 (*Bishop, J.*, dissenting).

The state filed a petition for certification to appeal to this court, which we granted, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the trial court lacked inherent common-law authority to modify its judgment of dismissal within four months of the date on which it was rendered?" And (2) "[d]id the Appellate Court properly reverse the trial court's decision to open its judgment despite the fact that the judgment of dismissal was predicated on a material misrepresentation made to the trial court?" *State* v. *Butler*, 343 Conn. 904, 272 A.3d 1126 (2022).

After reviewing the parties' briefs, the record, and the oral argument, we conclude that the Appellate Court's reasoning and analysis were sound and its conclusion was correct on both issues. Specifically, we conclude that the trial court lost jurisdiction upon rendering a final and unconditional judgment of dismissal; therefore, it lacked jurisdiction to entertain or grant the state's motion to open. Second, we agree that the record does not support any finding by the trial court of intentional or material misrepresentations; accordingly, we need not address the question of whether intentional

State *v.* Butler

misrepresentations provided the court with a basis to claim jurisdiction to open its judgment of dismissal. Nevertheless, we clarify two points in support of the Appellate Court's conclusion that the trial court lost jurisdiction upon rendering its judgment of dismissal. First, we make explicit what we implied in *State* v. *McCoy*, supra, 331 Conn. 561, that the four month rule permitted by statute in the context of civil cases is inapplicable to criminal cases. See id., 574–75, 580–87. Second, we explain that the unconditional dismissal of all charges is a final disposition of the case that deprives the trial court of any further jurisdiction over the matter.

We begin by addressing the "four month rule" and its purported applicability to criminal cases. As the Appellate Court extensively discussed, our trial courts are courts of general jurisdiction. See *State* v. *Butler*, supra, 209 Conn. App. 81; see also, e.g., *State* v. *Ramos*, 306 Conn. 125, 133, 49 A.3d 197 (2012). "In the absence of statutory or constitutional provisions, the limits of [their] jurisdiction are delineated by the common law." (Internal quotation marks omitted.) *State* v. *Ramos*, supra, 133–34. At common law, the Superior Court sat in sessions; see General Statutes (Rev. to 1977) § 51-181; and possessed inherent power to modify its judgments during the term during which they were rendered.[5] "During the continuance of a term of court the judge holding it ha[d], in a sense, absolute control over judgments rendered; that is, he [could] declare and subsequently modify or annul them." *Sturdevant* v. *Stanton*, 47 Conn. 579, 580 (1880). The common law has long recognized that, "during the term [in which] any judicial act is done, the record remaineth in the breast of the judges of the court, and in their remembrance, and

---

[5] This court has interpreted the word "term," as used in the common-law rule, to refer to "sessions" of the Superior Court, as it was defined in early enactments of General Statutes § 51-181. See, e.g., *Snow* v. *Calise*, 174 Conn. 567, 571–72, 392 A.2d 440 (1978).

State *v.* Butler

therefore the roll is alterable during that term . . . .''
(Internal quotation marks omitted.) *Commonwealth* v.
*Weymouth*, 84 Mass. (2 Allen) 144, 145 (1861). "The
authority thus exercised is probably founded on the
practice by which the record is not finally made up
until the end of the term or session of the court, when
'the roll,' as it is called, is signed and returned.[6] Until
then, it remains in the control of the court, and no entry
therein is deemed to be final, or beyond the power of
the court to amend or alter it, either for error or other
sufficient cause.'' (Footnote added.) Id. Additionally, in
the criminal context, a trial court was also divested of
jurisdiction upon any action in execution of a defen-
dant's sentence. See, e.g., *State* v. *Pallotti*, 119 Conn.
70, 74, 174 A. 74 (1934). "This is so because the court
loses jurisdiction over the case when the defendant is
committed to the custody of the [C]ommissioner of
[C]orrection and begins serving the sentence.'' (Internal
quotation marks omitted.) *State* v. *McCoy*, supra, 331
Conn. 581–82.

The legislature modified the structure of our court
system in 1977 when it revised General Statutes (Rev.
to 1977) § 51-181 to remove any reference to the "ses-
sions'' of court and, rather, provided in relevant part
that the Superior Court "shall sit continuously through-
out the year, at such times and places and for such
duration of time as is fixed and determined by the chief
court administrator . . . .'' Public Acts 1977, No. 77-
576, § 27. In amending the statute to remove any refer-
ence to sessions or terms of the court, the legislature
rendered the previous rule regarding continuing juris-
diction during the term inoperable. We recognized this

---

[6] It is notable that the rationale for permitting continuing jurisdiction until
the end of the term—that the "roll'' remained in the hands of the judges
and was not signed until the end of the term—is no longer relevant in our
present court operations because orders become finalized at the time they
are issued. See *Commonwealth* v. *Weymouth*, supra, 84 Mass. (2 Allen) 145.

State *v.* Butler

change in *State* v. *Luzietti*, 230 Conn. 427, 646 A.2d 85 (1994), in which we noted that the rule "no longer has vitality in this state." Id., 432 n.6. This modification did not, however, impact the existing common-law rule that "a trial court has the discretionary power to modify or vacate a criminal judgment before the sentence has been executed." (Internal quotation marks omitted.) *State* v. *McCoy*, supra, 331 Conn. 581.

Since the revision to General Statutes (Rev. to 1977) § 51-181, the legislature has granted continuing jurisdiction to the Superior Court in particular circumstances. For example, the legislature has authorized the court to modify the terms of probation, even after a sentence is imposed; see General Statutes §§ 53a-29 (c), 53a-30 (c) and 53a-32 (d); and to hear a petition for a new trial filed following sentencing. See General Statutes § 52-270 (a). Significantly, the legislature enacted § 52-212a, which provides in relevant part that, "[u]nless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, *a civil judgment or decree* rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which the notice of judgment or decree was sent. . . ."[7] (Emphasis added.) The legislature has not, however, enacted any similar statutory provisions permitting a trial court to retain general jurisdiction over criminal judgments for a designated period of time following a final disposition.

We recognize that, notwithstanding the legislature's action in the civil context, this court, in *State* v. *Wilson*, supra, 199 Conn. 417, concluded that the four month rule in § 52-212a extended to criminal judgments. See id., 437. Specifically, this court, without any analysis,

_____

[7] Practice Book § 17-43 (a), which sets forth the procedures for *civil matters*, contains similar language.

State *v.* Butler

concluded: "We see no reason to distinguish between civil and criminal judgments in this respect, and we therefore hold that, for purposes of the [common-law] rule, a criminal judgment may not be modified in matters of substance beyond a period of four months after the judgment has become final." Id. This court, however, did not ultimately utilize the four month rule to confer jurisdiction on the Superior Court in that case. See id., 438.

Following *Wilson*, this court, in *State* v. *McCoy*, supra, 331 Conn. 561, clarified that *Wilson* cannot be read as expanding the jurisdiction of the trial courts, and any reliance on the decision for that purpose is misplaced. See id., 581–82, 586–87. We explained that the common-law rule that jurisdiction is lost upon execution of the defendant's sentence remains viable and controlling, and we overruled *Wilson*[8] to the extent that it reached a conclusion that was inconsistent with that proposition.[9] Id., 586–87.

Although *McCoy* did not address the general applicability of the four month rule in criminal cases prior to the execution of a sentence, we take the opportunity to do so now. Our review of the common law and subsequent statutory provisions leads us to conclude that *Wilson* was wrongly decided, and we overrule it to the extent that it concluded that the four month rule applies in the criminal context. The court in *Wilson* failed to consider the differences between the civil and

---

[8] *McCoy* also overruled in part *State* v. *Myers*, supra, 242 Conn. 136. See *State* v. *McCoy*, supra, 331 Conn. 586–87. *Myers* disregarded the established principle that a trial court loses jurisdiction upon execution of the sentence and instead cited to *Wilson* in concluding that the court retained jurisdiction to entertain a motion for a new trial, even after execution of a sentence, because it was within the four month period. See id., 583–87; see also *State* v. *Myers*, supra, 136.

[9] The Appellate Court's opinion in the present case provides a thorough overview of this lineage of cases. See *State* v. *Butler*, supra, 209 Conn. App. 88–94.

criminal contexts. Moreover, its conclusion that there was "no reason" *not* to apply the civil rule to the criminal context is analytically backward. *State* v. *Wilson*, supra, 199 Conn. 437. The proper inquiry is whether there was specific statutory authority *to* apply the civil rule in the criminal context, not whether there was a prohibition to extending it beyond what was legislatively authorized. The conclusion in *Wilson* usurped the proper role of the legislature and ignored the limitations that it inserted in § 52-212a, which applied the four month rule only in the civil context. We agree with the Appellate Court in the present case that "the court in *Wilson* provided absolutely no rationale for extending the four month rule to criminal judgments . . . ." *State* v. *Butler*, supra, 209 Conn. App. 94.

As the Appellate Court stated, "the four month time period is not itself a creature of the common law; indeed, no such rule existed. Rather, it is the result of legislation and court rule, both of which expressly limit its application to a 'civil judgment or decree . . . .' " Id., 93–94. Neither of those enactments contemplates application in the criminal context. It is well established that "[w]e are not permitted to supply statutory language that the legislature may have chosen to omit." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *State Board of Labor Relations*, 296 Conn. 594, 605, 996 A.2d 729 (2010). Therefore, it is not appropriately within our purview to infer jurisdiction when no statutory provision exists to grant it.

Having concluded that the four month rule does not apply in the criminal context and that a trial court loses jurisdiction over a criminal matter once a sentence has been executed, the question that remains is whether the dismissal of criminal charges also divests the trial court of jurisdiction. We agree with the Appellate Court's conclusion that the dismissal in the present case was a complete and final resolution of all pending

State *v.* Butler

charges, and, therefore, the trial court lost jurisdiction following that action. See *State* v. *Butler*, supra, 209 Conn. App. 80–81, 103–104. We find it useful, however, to expand on the Appellate Court's rationale.

There is no case law or statutory authority directly addressing the effect of a complete dismissal of criminal charges on a trial court's jurisdiction. Existing authority in the criminal context generally, however, is instructive on this question. It is well established that the authority of the Superior Court over criminal cases derives from the presentment of an information, which is "essential to initiate a criminal proceeding." *Reed* v. *Reincke*, 155 Conn. 591, 598, 236 A.2d 909 (1967). Here, to resolve the charges against him, the defendant applied for and was accepted into a pretrial supervised diversionary program for persons with psychiatric disabilities. Upon the successful completion of the program and application for dismissal, § 54-56*l* (i) promises dismissal of the charges. Furthermore, the statute also provides for erasure of any record of the charges under General Statutes § 54-142a upon successful completion of the program. General Statutes § 54-56*l* (i). When the information, which contains the charges and establishes the jurisdiction of the trial court, is dismissed, the court's jurisdiction is extinguished because there is then no valid charging document pending before the court to confer jurisdiction on it.

One example illustrating this principle is the trial court's loss of jurisdiction upon entry of a nolle prosequi. "The effect of a nolle is to terminate the particular prosecution of the defendant without an acquittal and without placing him in jeopardy. . . . Therefore, the nolle places the criminal matter in the same position it held prior to the filing of the information. Indeed, no criminal matter exists until, and if, the prosecution issues a new information against the defendant. As our rules explain, [t]he entry of a nolle prosequi terminates

State *v.* Butler

the prosecution and the defendant shall be released
from custody. If subsequently the prosecuting authority
decides to proceed against the defendant, a new prose-
cution must be initiated. . . . The defendant is accused
of no crime, is released from custody unconditionally
and is no longer under the authority of the [trial] court.
It follows that, generally, *a court does not have jurisdic-*
*tion over the case after the entry of a nolle. . . .*
Although this court has recognized a narrow exception
to this general rule, that exception is not applicable
in [this] case.''[10] (Citations omitted; emphasis added;
footnote omitted; internal quotation marks omitted.)
*State* v. *Richardson*, 291 Conn. 426, 430, 969 A.2d 166
(2009). The dismissal following completion of a diver-
sionary program similarly places the case in a state in
which ''no criminal matter exists . . . .'' (Internal quo-
tation marks omitted.) Id. Therefore, without pending
charges, the trial court does not possess jurisdiction
over the case.

Other jurisdictions have similarly concluded that a
trial court is divested of jurisdiction and authority upon
the dismissal of all criminal charges. For example, the
Appellate Court highlighted *Smith* v. *Superior Court*,
115 Cal. App. 3d 285, 171 Cal. Rptr. 387 (1981), in which
the California Court of Appeal concluded that, ''at least
[when] no actual fraud has been perpetrated [on] the
court, a criminal court has no authority to vacate a
dismissal entered deliberately but [on] an erroneous
factual basis.'' Id., 287; see also *State* v. *Butler*, supra,
209 Conn. App. 99. Similarly, the Washington Court

_____

[10] The narrow exception mentioned in *Richardson* is from *State* v. *Lloyd*,
185 Conn. 199, 205–206, 440 A.2d 867 (1981), in which we concluded that
''the trial court retains jurisdiction after the entry of a nolle prosequi over
the defendant's objection when the defendant has a motion to dismiss on
other grounds pending before the court prior to the entry of the nolle.''
*State* v. *Richardson*, 291 Conn. 426, 430 n.5, 969 A.2d 166 (2009). We need
not address the continued viability of this rule because it is not at issue in
this case.

State *v.* Butler

of Appeals has concluded that "[a] criminal action is commenced by the filing of an indictment or information. . . . Thus, a [trial] court acquires subject matter jurisdiction over a criminal action only at such time as an indictment or information is filed . . . [and] loses subject matter jurisdiction when the indictment or information is dismissed." (Citations omitted.) *State* v. *Corrado*, 78 Wn. App. 612, 615, 898 P.2d 860 (1995). The Missouri Court of Appeals has also concluded that, "[o]nce a nolle prosequi has been entered, the trial court loses jurisdiction to proceed with the case." *Kilgore* v. *State*, 70 S.W.3d 621, 623 (Mo. App. 2002). Lastly, the Texas Court of Criminal Appeals has explained: "It is well settled that when a trial court empowered with jurisdiction over a criminal case sustains a motion to dismiss the indictment or information, the person accused thereunder is, in law, discharged from the accusation against him; there is, concomitant to such dismissal, no case pending against the accused and, accordingly, no jurisdiction remaining in the dismissing court." *State ex rel. Holmes* v. *Denson*, 671 S.W.2d 896, 898–99 (Tex. Crim. App. 1984).

CONCLUSION

The Appellate Court correctly concluded that the trial court lost jurisdiction when it dismissed the defendant's pending charges and, therefore, was without jurisdiction to entertain the state's motion to open the judgment and reinstate the charges. We also agree with the Appellate Court's conclusion that we need not decide whether the civil rule permitting a trial court to open a judgment obtained by fraud applies in the criminal context because the record before us does not support a finding of fraud or intentional misrepresentation.

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and MULLINS and MOLL, Js., concurred.

State *v.* Butler

D'AURIA, J., concurring in part and concurring in the judgment. In this certified appeal, the majority once again holds that the legislature has stripped the courts of this state of their inherent common-law authority to open, correct, or modify a judgment, today, a judgment of dismissal following a defendant's completion of a diversionary program. I disagree that our courts have been legislatively dispossessed of this inherent authority, but, because I agree that the trial court should have denied the state's motion to open in this particular case, I concur in the judgment.

We have long recognized that, at common law, courts of general jurisdiction in this state had inherent power to open, correct, or modify judgments. See, e.g., *Wolfork* v. *Yale Medical Group*, 335 Conn. 448, 469, 239 A.3d 272 (2020); *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 106, 952 A.2d 1 (2008). This principle is deeply rooted in our common law and reflects the beneficent policy that courts should be able to admit and correct mistakes, whether their own mistakes or those of the parties, to do justice. See *State* v. *Luzietti*, 230 Conn. 427, 440, 646 A.2d 85 (1994) (*Katz, J.*, dissenting) ("we should recognize the trial court's inherent power to correct errors of substance within a reasonable time in order to do justice"). Historically, this included the authority to grant a motion for a new trial, which is a "[common-law] power [that] the courts . . . have the right to exercise in such a manner as shall best promote justice." *Zaleski* v. *Clark*, 45 Conn. 397, 404 (1877).

It has never been questioned—and neither the parties nor the majority in the present case questions—whether the general common-law rule that courts have inherent authority to open, correct, or modify judgments applied equally to all courts of general jurisdiction, which, in Connecticut, include criminal courts. See *State* v. *Ramos*,

State *v.* Butler

306 Conn. 125, 133–34, 49 A.3d 197 (2012) ("The Superior Court is a constitutional court of general jurisdiction. In the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law." (Internal quotation marks omitted.)). For purposes of my discussion here, I will assume the same. The majority assumes, too—or does not challenge—that this common-law authority, as late as 1978, extended to the authority of courts to open, correct, or modify judgments dismissing criminal charges.

Because the policy favoring the finality of judgments competes with the beneficent policy permitting courts to rectify their mistakes, litigation has usually centered on how long and under what circumstances courts should be able to exercise their inherent power to open, correct, or modify their judgments. See, e.g., *People* v. *Karaman*, 4 Cal. 4th 335, 348, 842 P.2d 100, 14 Cal. Rptr. 2d 801 (1992) (recognizing that common-law rule "that the trial court may change its judgment only during the term in which the judgment was rendered, but not thereafter . . . was established in order to provide litigants with some finality to legal proceedings" (citations omitted; footnote omitted)). The present case is only the most recent example of this court's often tortured attempts to accommodate these competing public policies, which sometimes results in manufactured rules; see *State* v. *Wilson*, 199 Conn. 417, 437, 513 A.2d 620 (1986) (borrowing civil rule of practice providing for four months to open judgments); exceptions to exceptions to those rules; see *State* v. *Myers*, 242 Conn. 125, 131, 136, 698 A.2d 823 (1997) (court had jurisdiction to rule on motion for new trial based on juror bias five months after defendant had been sentenced); and, most recently, in the present case and in *State* v. *McCoy*, 331 Conn. 561, 586–87, 206 A.3d 725 (2019), in the overruling of the exceptions to the exceptions (i.e., *Wilson* and

State *v.* Butler

*Myers*) in an attempt to clean up our case law and make the lines brighter.

*McCoy* involved the question of whether there was, or ought to be, an exception to the common-law, temporal limitation on the court's inherent authority to correct its mistakes—that is, that the trial court loses jurisdiction over the case when the convicted defendant is committed to the custody of the Commissioner of Correction and begins serving his sentence—that would permit the trial court to rule on a timely filed motion before the court had sentenced the defendant. Id., 574–75. The majority in *McCoy* answered this question in the negative: i.e., our law could not abide such an exception and, to the extent that we had permitted such an exception in the past, threw shade on our precedent. See id., 588–89; see also id., 583 (expressing "serious concerns" about *Myers'* "rationale and the implications . . . were we to follow it without question"). As I explained in my concurrence and dissent in *State* v. *McCoy*, supra, 331 Conn. 600 (*D'Auria, J.*, *Palmer* and *McDonald, Js.*, concurring in part and dissenting in part), I believe the majority's holding in that case created an illogical result and was avoidable if we had acted like the common-law court we are and found exceptions to a rule—or relied on existing exceptions—when good sense calls for it. As in *McCoy*, the rule at issue in the present case is "a common-law rule borne out of experience and sensibility"; O. Holmes, The Common Law (P. Pereira & D. Beltran eds., 2011) p. 5; and "this court has the inherent power to define its contours to ensure that its application does not lead to unsensible and unjust results . . . ." *State* v. *McCoy*, supra, 614 (*D'Auria, J.*, concurring in part and dissenting in part). I will not repeat the entirety of that analysis here.

In the present case, I believe that the majority repeats the error of *McCoy* and earlier cases by assuming—indeed, holding—that the legislature in 1977 abrogated

State *v.* Butler

the authority of our courts to open, correct, or modify
judgments and that it did so by eliminating the word
"sessions" from General Statutes (Rev. to 1977) § 51-
181. See Public Acts 1977, No. 77-576, § 27 (P.A. 77-576).
I agree with the majority that the common-law rule, as
measured by sessions of the court, is now obsolete.
But, in my view, the notion that this legislative change
abrogated our trial courts' inherent authority to open,
correct, or modify judgments is not an inescapable con-
clusion. Rather, I would conclude that courts of this
state still have this authority, even though fashioning
a rule in the context of this case—the unappealed judg-
ment dismissing a criminal case—might present chal-
lenges that cannot be overcome.

It is necessary first to review some of the history of
General Statutes § 51-181 and, in doing so, to bear in
mind our general rule of construction that, when a stat-
ute seeks to limit a court's common-law jurisdiction,
we strictly construe that statute so as to limit any incur-
sion on our authority only to the extent expressly and
explicitly stated by the legislature. See, e.g., *Sastrom*
v. *Psychiatric Security Review Board*, 291 Conn. 307,
324–25, 968 A.2d 396 (2009) (explaining that legislature
knows how to expressly limit scope of court's jurisdic-
tion, and, if no intent to limit is expressed, then statute
does not divest court of jurisdiction). This rule of con-
struction is consistent with the even more general rule
that the court's common-law general jurisdiction is
broad and that "there is a strong presumption in favor
of jurisdiction"; *State* v. *Ramos*, supra, 306 Conn. 134;
and is a concrete application of the well established
maxim that we must strictly construe statutes in deroga-
tion of the common law. See, e.g., *Fennelly* v. *Norton*,
294 Conn. 484, 505, 985 A.2d 1026 (2010). We must also
keep in mind that the Superior Court is a court of
general jurisdiction, and, therefore, "[i]n the absence of
statutory or constitutional provisions, the limits of its

State *v.* Butler

jurisdiction are delineated by the common law.'' (Internal quotation marks omitted.) *State* v. *Ramos*, supra, 133–34.[1]

As the majority correctly notes, at common law, courts had the inherent power to open, correct, or modify their own judgments. This authority was limited in duration, however. Nearly 150 years ago, we described that limitation as follows: ''During the continuance of a term of court the judge holding it has, in a sense, absolute control over judgments rendered; that is, he can declare and subsequently modify or annul them.'' *Sturdevant* v. *Stanton*, 47 Conn. 579, 580 (1880). Over 100 years later, and since then, we have indicated that, at common law, ''a trial court possesses the inherent power to modify its own judgments during the term at which they were rendered.'' *State* v. *Wilson*, supra, 199 Conn. 436; see also *Snow* v. *Calise*, 174 Conn. 567, 571–72, 392 A.2d 440 (1978).[2] At common law, even when the term had not yet ended, a trial court did not have jurisdiction to modify its judgment after a person had begun to serve his or her sentence. See *State* v. *Henkel*, 23 Conn. Supp. 135, 138, 177 A.2d 684 (Conn. Cir. 1961) (''[w]hile the established rule is that [a] sentence in a criminal case may be modified at any time during the term of court at which it was imposed, such modification cannot be made after an act has been done in execution of it'' (internal quotation marks omitted)). There are, however, common-law exceptions to this

---

[1] The majority confuses this maxim and insists that ''it is not appropriately within our purview to infer jurisdiction when no statutory provision exists to grant it.''

[2] The majority correctly observes that this court has interpreted the word ''term'' to refer to ''sessions'' of the court, ''as it was defined in early enactments of § 51-181.'' The word ''term,'' as used in the common-law rule that a judgment may not be opened after the term during which it was rendered, has been interpreted to mean ''sessions'' of court, as defined in § 51-181, and not the statutory annual term provided for in General Statutes § 51-179. *Cichy* v. *Kostyk*, 143 Conn. 688, 695–96, 125 A.2d 483 (1956).

State *v.* Butler

general rule, one being that trial courts retain jurisdic-
tion after sentencing to correct an illegal sentence. See,
e.g., *State* v. *Parker*, 295 Conn. 825, 835–36, 992 A.2d
1103 (2010). There is also a common-law exception
recognizing that trial courts have "inherent" power,
"independent of [any] statutory provisions," to open a civil
judgment "obtained by fraud" "in the actual absence
of consent, or because of mutual mistake" at any time.
*Kenworthy* v. *Kenworthy*, 180 Conn. 129, 131, 429 A.2d
837 (1980).[3]

Prior to 1965, § 51-181 provided that there "shall be
such sessions of the superior court . . . held annually
. . . at such times and such places and for such dura-
tion of time as is fixed and determined by the chief
judge of the superior court . . . ." General Statutes
(Cum. Supp. 1963) § 51-181. Therefore, the duration of
time in which courts had the jurisdiction to open, cor-
rect, or modify their judgments was limited by the chief
judge's decision regarding how long the sessions were
to be held. In 1965, the legislature amended § 51-181 to
specify that the court "shall be deemed continuously
in session with four quarterly sessions . . . held on the
second Tuesday of September, December, March and
June annually . . . at such times and places and for
such duration of time as is fixed . . . by the chief judge
of the superior court . . . ." Public Acts, Spec. Sess.,
February, 1965, No. 331, § 21, codified at General Stat-
utes (Cum. Supp. 1965) § 51-181. This further limited
the duration in which courts could open their judgments
because, although the chief judge still retained authority
to set the duration of the sessions, each session had to
begin on a particular day and end by the next specified
start date.

In 1977, the statute was modified to remove any refer-
ence to sessions, providing that "[t]he superior court

---

[3] As the majority notes, it is not clear whether this particular rule applies
in the criminal context, and we need not reach that issue in this case.

State *v.* Butler

shall sit continuously throughout the year, at such times and places and for such duration of time as is fixed and determined by the chief court administrator . . . .'' P.A. 77-576, § 27 (effective July 1, 1978). This statutory change was accomplished alongside numerous other statutory changes—including the reorganization of judicial districts and the increase of salaries of judges. See generally P.A. 77-576. This modification to § 51-181 was one section of a sixty-five section bill the purpose of which was to ensure an efficient transition to the reorganized, one tier court system that the legislature established the previous year; see Public Acts 1976, No. 76-436; which merged the Court of Common Pleas and the Juvenile Court with the Superior Court. When testifying in favor of the bill before the Judiciary Committee, a representative from the Office of the Executive Secretary of the State Judicial Department[4] noted that, since the merger of the courts in 1976, there was confusion regarding the use of the words "term" and "session." See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1977 Sess., p. 1360, remarks of Harriett Rosen. This bill clarified that confusion in part by keeping language that was already present in the statute— that the court was "continuously" in session—but removing the reference to "sessions." P.A. 77-576, § 27. Thus, the legislature removed the time frame for when a trial court could exercise its inherent authority to open, correct, or modify judgments. There is nothing in the alterations to the statutes governing the court system, however, that explicitly divests the courts of their inherent authority to open, correct, or modify judgments.

---

[4] Although this position no longer exists, at the time, the Office of the Executive Secretary of the State Judicial Department was a position appointed by the Chief Court Administrator, and the individual appointed to that position handled the administration of the nonjudicial business of the Judicial Department. See General Statutes (Rev. to 1977) § 51-8.

State *v.* Butler

Concurrently with this change, in § 28 of P.A. 77-576, which was codified at General Statutes (Rev. to 1979) § 52-212a, the legislature established what is now referred to as the "four month" rule. General Statutes (Rev. to 2019) § 52-212a provided that, "in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed." In other words, having explicitly removed the time frame for when the court may exercise its inherent authority to open, correct, or modify judgments, the legislature filled in the gap by creating the four month rule, explicitly divesting the court of its common-law authority to open, correct, or modify judgments in civil cases. See General Statutes (Rev. to 2019) § 52-212 (a). No similar statute was enacted for criminal judgments. However, just because the legislature provided a specific rule for civil judgments does not necessarily mean it intended to eviscerate a court's jurisdiction in criminal cases to open, correct, or modify. This begs the question: assuming that jurisdiction previously existed, what happened to the court's inherent common-law authority to open, correct, or modify a judgment in the criminal context?

The majority infers from the legislature's removal of the reference to court "sessions" in § 51-181, a small part of a bill intended to implement an omnibus court reorganization bill, that, at the same time the legislature explicitly removed the timing of the court's sittings, it implicitly also took away the courts' common-law authority to open, correct, or modify criminal judgments. That is to say, the legislature not only removed the time frame during which the courts could exercise their inherent authority but also divested the courts of that authority entirely.

State *v.* Butler

The majority reasons that "it is not appropriately within our purview to infer jurisdiction when no statutory provision exists to grant it." This is unquestionably true when we had no common-law jurisdiction in the area. But we have also said that "[t]he Superior Court is a constitutional court of general jurisdiction. In the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law." (Internal quotation marks omitted.) *State* v. *Ramos*, supra, 306 Conn. 133–34.

It is well established that, at common law, a trial court had the discretionary power to open, correct, or modify its judgment. Id., 134. This court has identified two common-law, temporal limitations on this power. The first is not at issue: that a court loses jurisdiction after a defendant's sentence has been executed. See, e.g., *State* v. *Pallotti*, 119 Conn. 70, 74, 174 A. 74 (1934). The second was that the court's jurisdiction to open, correct, or modify a judgment is limited to the term or session in which the judgment was rendered. See *Sturdevant* v. *Stanton*, supra, 47 Conn. 580. Now that the Superior Court—by legislative action—no longer sits in terms or sessions, a court term or session cannot constitute the measure of the temporal limit of the courts' jurisdiction. But I do not agree that it is ineluctable that this means the courts now lack this authority entirely. Indeed, nothing in the amendments passed in 1977 explicitly divested or limited the courts' authority to open, correct, or modify criminal judgments.

As this court must strictly construe statutes that seek to limit the courts' common-law authority, looking to the explicit language removed from § 51-181 by the 1977 amendment, why is it not as reasonable a conclusion that the legislature intended to *extend* the courts' authority to open, correct, or modify judgments by removing any temporal limitation? I disagree with the majority that the statutory changes altering the Superior Court's

State *v.* Butler

structure fully divested our courts of their common-law authority to open, correct, or modify criminal judgments. In my view, this reasoning too easily cedes inherent judicial authority to the legislature in a context in which I find no evidence that the legislature has sought to annex this authority for its own. In my view, upon the modest change in the statute, the judiciary retains its common-law authority to develop and adapt the common law in light of the fact that courts no longer sit in sessions. See *State* v. *Lombardo Bros. Mason Contractors, Inc.*, 307 Conn. 412, 436, 54 A.3d 1005 (2012) (acknowledging that this court has "authority to adapt the common law to the changing needs of society," although not in sovereign immunity cases); see also *Western Union Telegraph Co.* v. *Call Publishing Co.*, 181 U.S. 92, 102, 21 S. Ct. 561, 45 L. Ed. 765 (1901) ("the common law comprises the body of those principles and rules of action . . . which derive their authority . . . from the judgments and decrees of the courts" (internal quotation marks omitted)); *State* v. *McCoy*, supra, 331 Conn. 608 (*D'Auria, J.*, concurring in part and dissenting in part) ("[a]ccordingly, because the rule at issue is a common-law rule, this court has the authority to clarify, develop, and adapt the rule").

II

That begs the question of what is the proper rule to apply to the opening or modification of criminal judgments under our common law. I note initially that it is unclear if the court's pre-1977 common-law authority to open, correct, or modify a judgment before the end of the session applied to the dismissal of criminal cases at all. As I will discuss, there are sound reasons why the authority to open, correct, or modify a judgment should not extend to judgments of dismissal. If this authority did not exist before 1977, then the courts do not have this authority now, and this court may not extend its jurisdiction beyond the bounds that existed

State *v.* Butler

at common law. See *State* v. *Ramos*, supra, 306 Conn. 133–34 ("[i]n the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law" (internal quotation marks omitted)). I am unaware of, and the parties have not cited, any case law regarding whether the common-law rule governing the opening and modification of judgments extended to criminal judgments. This might be the answer.

Absent conclusive evidence that this common-law rule did not apply to criminal judgments of dismissal, I will assume that it did. In making this assumption, I am mindful of the fact that our state courts are common-law courts; see *State* v. *Luzietti*, supra, 230 Conn. 431 ("The Superior Court is a constitutional court of general jurisdiction. . . . In the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law." (Citation omitted; footnote omitted.)); and this court is the ultimate arbiter of the scope of our courts' common-law jurisdiction. See, e.g., *Stuart* v. *Stuart*, 297 Conn. 26, 45, 996 A.2d 259 (2010) ("it is manifest to our hierarchical judicial system that this court has the final say on matters of Connecticut law"). Thus, once the legislature amended § 51-181 to eliminate the word "sessions," it was for this court to then decide the impact of this change on the common-law authority to open, correct, or modify criminal judgments.

Common-law judging often involves the search for a sensible rule that accommodates the interests implicated, and, in this case, any new common-law rule would have to be limited in a way that does not enhance our common-law jurisdiction. The rule the majority announces today as a matter of first impression—that, by legislative action in 1977, courts lost their inherent authority to open, correct, or modify criminal judgments of dismissal immediately—is actually an exception to the general rule that I have already referred to twice: that

State *v.* Butler

courts have inherent authority to do so. But as I explained, because the legislature has not explicitly abrogated the courts' common-law authority to open, correct, or modify criminal judgments, I disagree with the exception the majority adopts. Rather, assuming that the common-law rule historically applied to criminal judgments, a review of our relevant case law regarding jurisdiction in criminal cases provides guidance for the rule that I suggest this court could consider adopting in light of the legislature's elimination of the word "sessions" in § 51-181: that courts retain jurisdiction to open, correct, or modify a criminal judgment during the twenty day appeal period if the state places the defendant on notice at the time of judgment that it may seek to appeal.

As the majority correctly notes, the dismissal of criminal charges is a complete and final resolution of all pending charges, and, under the reasoning in *McCoy*, a trial court would lose jurisdiction following that action, similar to an acquittal. The state does have the statutory right to seek permission to appeal from any dismissal of charges pursuant to General Statutes § 54-96. This court has held that, "[u]nder § 54-96 . . . permission to appeal [is] jurisdictional because, at common law, the state had no right to appeal in criminal cases." *Simms* v. *Warden*, 230 Conn. 608, 614, 646 A.2d 126 (1994). One important limit to the state's ability to appeal is that, "to protect the rights of both the [s]tate and the accused and to have an orderly procedure, it was essential that the practice under the statute of 1886 [the original statute giving the state the right to appeal in a criminal case] should require the [s]tate's [a]ttorney or prosecutor to secure from the presiding judge permission to appeal *at the time the judgment of acquittal* [*or dismissal*] *was rendered*." (Emphasis added.) *State* v. *Carabetta*, 106 Conn. 114, 117, 137 A. 394 (1927). In recognizing this restriction, this court in *Carabetta* acknowledged that "[t]he instances [in which a prosecu-

State *v.* Butler

tor] will not know at the time of the judgment whether or not he should appeal will be few. The consequences to [the] [s]tate and [to the] accused compel this practice, and the incidental occasional inconvenience to the prosecutor must be accepted for the larger public interests involved—the just interests of the accused and of the [s]tate and of the orderly procedure which alone can make this statute effective and serviceable. . . . It is not necessary that the prosecutor shall at the moment of judgment reach a final determination that he will prosecute the appeal. It is necessary that he determine at the time of the judgment that he ought to ask the court for permission to take such appeal, so that the accused shall not be forthwith discharged . . . .'' (Citations omitted.) Id., 118–19.

This rule has been affirmed multiple times, including in *State* v. *Ross*, 189 Conn. 42, 46–47, 454 A.2d 266 (1983). The defendant in *Ross* claimed that the state's appeal should be dismissed because of the five day delay by the state in filing its written request for permission to appeal. Id., 46. On appeal, this court noted that ''[t]he evil perceived in granting a tardy request of the state to appeal was the injustice of dragging back into court a defendant who had reasonably assumed that his discharge meant that he was a free man no longer charged with a crime. *State* v. *Carabetta*, supra, [106 Conn.] 117. No such expectation could reasonably have been entertained by [the] defendants, however, because the state did express its intention to appeal at the time of judgment and the court refused to discharge the defendants when such a request was made during the proceeding. . . . The defendants were fully aware that the state intended to appeal.'' (Citation omitted.) *State* v. *Ross*, supra, 46. This has also become the expected course of action when the state intends to appeal from a dismissal of charges. See, e.g., *State* v. *Tucker*, 219 Conn. 752, 755–56, 595 A.2d 832 (1991); *State* v. *Rios*,

State *v.* Butler

110 Conn. App. 442, 448 n.6, 954 A.2d 901 (2008); *State*
v. *Tyler*, 6 Conn. App. 505, 507, 506 A.2d 562 (1986).

Because of the requirement, this court has explained
that the trial court loses jurisdiction absent notice at
the time of judgment that the state intends to appeal.
See *State* v. *Avcollie*, 174 Conn. 100, 109, 384 A.2d 315
(1977) (holding that court retained in personam juris-
diction over defendant because state expressed intent
to seek permission to appeal). When the state does
provide this notice, however, the court maintains con-
tinuing jurisdiction over the case. Id. In my view, it
would be a reasonable rule for this court to adopt—in
the absence of court "sessions" to measure the courts'
continuing jurisdiction to open, correct, or modify—
that, once the state provides notice of its intent to appeal
from a dismissal, the trial court retains jurisdiction to
decide any motion, including a motion to open, filed
within the twenty day appeal period. There is logic to
this rule in that it "imposes reasonable demands on the
trial attorneys to discover and disclose problems they
perceive with the judgment." *State* v. *Luzietti*, supra,
230 Conn. 440 (*Katz, J.*, dissenting). It also provides
the defendant with adequate notice that he may not
ultimately remain a free man. See *State* v. *Middleton*,
20 Conn. App. 321, 326–27, 566 A.2d 1363 (1989) (court
held that, although state did not explicitly express inten-
tion to appeal, because state took formal exception to
court's ruling, defendant was on notice of possibility
of appeal).

Nevertheless, even if the majority were to adopt this
rule, I would have to conclude that the majority reaches
the right conclusion in this particular case. Although
the state could not have announced its intent to appeal
at the time the charges against the defendant were
dismissed, as it could not have known the information
it would receive the next day, the prevailing notion that
a defendant is entitled to notice that his charges may

State *v.* Butler

be reinstated governs here as well. See *State* v. *Tucker*, supra, 219 Conn. 755. The state did not announce its intent to appeal from the dismissal of the criminal case or otherwise do anything to put the defendant on notice that the charges against him could be reinstated after the dismissal. Thus, at the time of judgment—the dismissal of the charges—because the state stated no intention to challenge the judgment, the trial court lost its jurisdiction. As a result, the trial court should have denied the state's motion to open because the defendant in this case would not have been on notice that the charges against him could have been reinstated. This result, however, does not necessitate the holding that the trial court does not have the inherent authority to open, correct, or modify its judgments in criminal cases because of an action taken by the legislature.

Finally, this court could decide that, without trial courts sitting in "sessions" any longer, there is no longer any sensible rule we can fashion that would appropriately cabin the trial courts' authority to open, correct, or modify criminal judgments of dismissal. We could conclude that the rule should be that courts no longer have any such authority. This would be a decision by this court, however, and would be a very different thing than concluding that the legislature removed from § 51-181 in the 1977 amendment a portion of the inherent common-law authority of our trial courts by eliminating any reference to "sessions."

Accordingly, I respectfully concur in part.